646 So.2d 408 (1994)
VERMILION BAY LAND COMPANY
v.
PHILLIPS PETROLEUM COMPANY, et al.
No. 93-CA-1393.
Court of Appeal of Louisiana, Fourth Circuit.
November 10, 1994.
Writ Denied March 10, 1995.
Lawrence E. Donohoe, Jr., Patrick G. Tracy, Jr., Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, for Vermilion Bay Land Co.
David N. Schell, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for Phillips Petroleum Co.
Rebecca W. Comeaux, B.J. Duplantis, Gordon, Arata, McCollam, Stuart & Duplantis, Lafayette, for Louisiana Moran, Inc.
Thomas J. Wyatt, Hargrove, Guyton, Ramey and Barlow, L.L.P., Shreveport, for The Cockrell Defendants and The Heller Defendants.
Before CIACCIO, WARD and ARMSTRONG, JJ.
WARD, Judge.
Vermilion Bay Land Company instituted suit against numerous defendants[1] seeking a *409 judgment that defendants' mineral servitudes and mineral leases of the servitudes on lands owned by Vermilion Bay have terminated. The case was tried before the district judge who made findings of fact and rulings of law which only granted part of the relief Vermilion Bay sought, holding a small portion of the disputed servitudes had expired for non-use. For the most part the trial court rejected Vermilion Bay's claims and upheld the servitudes and the leases. Vermilion Bay has appealed, contesting both the findings of fact and the rulings of law. The defendants have answered seeking modification of that part of the judgment in favor of Vermilion Bay.
Vermilion Bay claims liberative prescription of 10 years non-use has terminated the servitude, and the mineral leases thereof are invalid, or at least they have no effect as to Vermilion Bay. The claim of ten years non-use is predicated on Vermilion Bay's belief that the lands in question are non-contiguous to other lands subject to the servitude and which are being "used" [held] by production of or exploration for oil and gas. All parties concede that if the lands are "non-contiguous" within the meaning of Louisiana's Mineral Code, then neither production nor exploration on other tracts will "interrupt" or "suspend" the running of liberative prescription on the non-contiguous tracts, since the mineral servitude would not be "used" within the meaning of the Mineral Code. "Use" of a mineral servitude on one part of a tract does not suspend the running of liberative prescription of that part of the servitude on a non-contiguous tract, even when one servitude covers both tracts. Lee v. Giauque, 154 La. 491, 97 So. 669 (1923).
All of the land at one time belonged to the State of Louisiana, but the State later transferred it to a newly created Buras Levee District to be sold at auction for the purpose of raising funds to build levees and drainage canals. The Levee District sold the land to Ernest Cockrell. Both Vermilion Bay and the owners of the mineral servitude have acquired ownership from common ancestors in title: Ernest Cockrell, the Buras Levee District, and the State of Louisiana, and neither Vermilion Bay nor any of the defendants contests the chain of title of any party, plaintiff or defendants.
The land acquired from the Levee District is more than 52,500 acres of marshlands in Plaquemines Parish, but the disputed lands and servitudes relate to five parcels of the whole separated by water from other lands within the servitude. The five areas of dispute have been described as (1) The Bayou Dulac area, (2) The Lost Bayou area, (3) The Islands, (4) The Robinson Bayou area, and (5) The Bayou Huertes area. The "use" of mineral servitudes and leases on the remainder of the tract is not questioned, the issue is whether that "use" interrupts prescription of the five tracts, a question which depends on whether they are contiguous or non-contiguous.
Vermilion Bay contends that the five parcels are not contiguous because they are separated from the remainder of the tract by the beds of navigable streams and waterways, the bottoms of which are owned by the State. They are still owned by the State, Vermilion claims, because when the State transferred the land to the Buras Levee District the State could not transfer the beds of navigable streams. Thus, Vermillion Bay claims, the ownership remained in the State, and neither the Levee District nor any of Vermilion's ancestors in title acquired ownership.
The trial court made findings of fact as to navigability both as to the 1812 date and the date of severance of State ownership. The trial court's findings of fact as to navigability were based on over 100 exhibits and the testimony of both experts and lay persons. There is no question as to the qualifications of the experts, all were outstanding scholars in their fields. When the trial court, or any fact finder for that matter, makes a considered choice between witnesses and evidence, the scope of appellate review of those findings is extremely limited, particularly when the choice is between expert testimony. *410 Stobart v. State of Louisiana through DODT, 617 So.2d 880 (1993). Within that limited scope of review this court cannot say the trial court's findings of fact as to navigability are manifestly erroneous.
The State cannot alienate the beds of navigable waterways. The issue has been decided in Gulf Oil Corporation v. State Mineral Board, 317 So.2d 576 (La.1975) wherein the Supreme Court conclusively decided that the beds of navigable waters belonging to the State cannot be alienated by the State, and any patent or purported transfer is null. This however, does not resolve this dispute because the issue remains as to whether the prohibition against alienation refers only to beds of waterways that were navigable in 1812 when Louisiana became a State, or to beds of navigable waters at the time of severance from the State.
Vermilion contends the crucial period is the date of severance, while the defendants contends that the date of admission to the Union is the crucial date, arguing that alienation is prohibited only when the waterway was navigable in 1812 and also navigable at the time of alienation.
In four of the five disputed tracts described above, the trial court made findings of fact that resolve the dispute. The trial court found the waterways were not navigable either in 1812 or at the time of severance, as to tract 2, The Lost Bayou area; or as to tract 5, The Bayou Huertes area. Thus, the tracts were contiguous; use of part maintained the whole of the servitude. The trial court found that the waterways were navigable in 1812 and at the time of severance as to tract 3, The Islands, meaning they are non-contiguous, and that the servitude has expired. As to tract 4, The Robinson area, the trial court found that although a waterway was navigable, it did not completely sever the tract, and use by production of part was sufficient to interrupt prescription as to the whole.
Vermilion Bay has abandoned the appeal as to the disputed area described as tract 2, The Lost Bayou area; tract 3, The Islands; and tract 4, The Robinson Bayou area. Although defendants have also appealed, their appeal goes to adverse findings of fact which we have previously indicated were not manifestly erroneous, and which we affirm, rejecting defendants' appeal. For the same reasons we reject Vermilion Bay's appeal as to tract 5, The Bayou Huertes area.
In the Bayou Dulac area, however, the trial court made findings that raise the issue of what date is crucial, 1812 or the date of severance; because the trial court found Vermilion had not proven navigability in 1812, but found that Vermilion had proven that Bayou Dulac was a navigable waterway at the date of severance. Reasons for Judgment, p. 9 Nonetheless, the trial court ruled that ownership of the bed of Bayou Dulac was transferred by the State to the Levee District and ultimately to Vermilion Bay, ruling that the question of whether the waterway was navigable in 1812 was determinative of whether the State of Louisiana retained possession when it transferred ownership of the surrounding land. Since the trial court found Bayou Dulac was not navigable in 1812, it also found that the State could alienate its bed, and that it did so when it transferred the land by its patent. As a consequence of that finding the trial court held there was contiguity between the area north of Bayou Dulac and the area south of it, and use of any portion would maintain the servitude over the whole.
Vermilion argues that the crucial date for determining navigability and consequently whether the State had the authority to dispose of beds of certain waterways is not 1812, as the trial court found, but rather the date of severance of the property from the State, in this instance 1914, when the State transferred the lands to the Buras Levee District. Thus, Vermilion argues, the State did not transfer ownership of the bed of Bayou Dulac, title remained in the State, making the parts separated by Bayou Dulac non-contiguous to that part of the servitude that is held by production. Thus, use of the northern part of the servitude does not interrupt prescription as to the southern part.
As far as this court can tell, the issue has not been decided, and those cases relied upon by the trial court and the defendants do not consider whether the State can transfer ownership *411 of the beds of waterways navigable at the time of severance, although each turned on a finding that the stream was navigable in 1812. On the other hand, Gulf Oil Corp., supra, strongly indicates the State can never transfer the beds of waterways that are navigable at the time of severance, citing unusually strong policy reasons and historical prohibitions. The same policy reasons which would prohibit the alienation of ownership of beds of waterways that are navigable both in 1812 and at present are applicable to beds of streams that are not navigable in 1812 but become so before alienation.
Vermilion Bay's argument is persuasive. There is nothing in the Louisiana Civil Code which prohibits reclassification of property of the State from a "private thing" susceptible of alienation by the State to a "public thing" incapable of private ownership. In fact, the Civil Code and jurisprudence provides many examples of such reclassification. For example, although the State of Louisiana, in its sovereign capacity, acquired ownership of all natural navigable waterbeds in 1812 to the high water mark, Louisiana through its Civil Code has reclassified the lands situated between the high and low-water marks, in the case of navigable waters, as private things subject to public use. See Civil Code Article 456; State v. Richardson, 140 La. 329, 72 So. 984 (1916). The Code provisions relating to private ownership of alluvial and dereliction along a navigable river or stream again contemplates a reclassification of such property from "public" to "private." The same is true of the codal scheme governing ownership of land where a navigable river leaves its channel and forms a new bed. See Civil Code Article 504.
The Louisiana Supreme Court has also recognized that the bed of rivers that were navigable in 1812 but have subsequently become non-navigable can become private things susceptible of alienation by the State. See Chaney v. State Mineral Board, 444 So.2d 105 (La.1983); Wemple v. Eastham, 150 La. 247, 90 So. 637 (1922). Conversely, Miami Corp. v. State, 186 La. 784, 173 So. 315 (1936), cert. denied, 302 U.S. 700, 58 S.Ct. 19, 82 L.Ed. 541 (1937) recognized that when private property becomes part of the bed of a navigable lake of the State of Louisiana by natural processes, the submerged area becomes a portion of the beda public thing insusceptible of private ownership. This same legislative reclassification takes place when a formerly non-navigable waterbed within tidal overflow lands acquired by the State becomes navigable in fact prior to divestiture of such lands by the State. The bed of the waterbed, unlike the tidal overflow lands which contain it, becomes a public thing subject to public use and insusceptible of private ownership.
There is no sound reason to distinguish between the inalienable character of navigable waterbeds which existed in 1812 and were acquired under the equal footing doctrine and natural navigable waterbeds which, though non-navigable at the time such bottoms were acquired by the State of Louisiana under federal grant or other means of acquisition, become naturally navigable prior to segregation by the State. The public interest which favors retention of ownership of the bed in the State to assure free use of the waters for navigation and transportation is the same in each case. If that interest can be served by the mere recognition of a public servitude of passage, as suggested by the ruling of the trial court in this case, then the beds of water bottoms navigable in 1812 should be freely alienable under the same limitation.
Professor Lee Hargrave, in commenting upon the prohibition against alienation of the beds of navigable waterbeds under Section 3 of the 1974 Louisiana Constitution, states:
"More broadly, Section 3 is the basis for saying, consistent with traditional Civil Code principles, that these beds are out of commerce and insusceptible of private ownership. Not only are sales or other contractual alienation impossible, but such properties are incapable of acquisition by prescription or of seizure and sale by creditors of the State. In view of the constitutional reference to "navigable" water bodies and similar Civil Code provisions, a stream that becomes non-navigable is no longer under this rule, and the State may alienate its bed or authorize its alienation. The Constitution does not provide for loss of State ownership in such a case, but the prohibition against alienation is lifted. Conversely, if a non-navigable stream becomes *412 navigable, it would cease to be susceptible of private ownership and would become property of the State." See Hargrave, Statutory and Hortatory Provisions of the Louisiana Constitution of 1974, 43 La. Law Rev. at 660-661 (1983).
Professor Yiannopoulos also indicates that by application of Article 450 of the Civil Code, a body of water which, though non-navigable in 1812, subsequently becomes navigable by natural forces, is a public thing. While he notes that a divestiture of private ownership by such reclassification would run afoul of constitutional prohibitions against the taking of property without compensation, no such limitation arises when the legislative reclassification occurs prior to segregation of the waterbed by the State; in fact, the navigable status of the waterbed prior to segregation precludes the creation of private ownership in the bed of the water. See, generally, A.N. Yiannopoulos, 2 La. Civil Law Treatise Property (3rd Ed.) § 63 (1991).
We therefore reverse the trial court's judgment with respect to that area described as the Bayou Dulac area, finding production on part of the servitude was not use of the whole, and that the servitude on the non-producing portion is liberated by prescription of 10 years. In all other respects, we affirm the remainder of the judgment for the reasons given by the trial court in its excellent reasons for judgment, which we append to this opinion.
REVERSED IN PART; AFFIRMED IN PART.

APPENDIX

TWENTY-FIFTH JUDICIAL DISTRICT COURT

PARISH OF PLAQUEMINES

STATE OF LOUISIANA

DIVISION "A"

NO. 29-542

VERMILION BAY LAND COMPANY

VS.

PHILLIPS PETROLEUM CO., ET AL.
 /s/ Signature
 Deputy Clerk
DATE FILED: Dec. 14, 1992

REASONS FOR JUDGMENT

I

INTRODUCTION

A. PROCEDURAL POSTURE.
This case came on for trial on September 4-6, 1990, to the Court sitting without a jury. The suit is brought by Vermilion Bay Land Company ("Vermilion Bay") against The Cockrell Foundation, Alf Roark, W.F. Wright, Jr., and W.C. Miley, in their capacities as trustees of (i) The Virginia H. Cockrell Louisiana Trust, (ii) the Carol Cockrell Jennings Louisiana Testamentary Trust, (iii) the Ernest H. Cockrell Louisiana Trust, (iv) The Ernest H. Cockrell Louisiana Testamentary Trust, (v) The Carol D. Cockrell Louisiana Trust ("Cockrell Defendants"), and Theo M. Heller and Edward M. Heller, individually and as coexecutors of the Succession of Mildred H. Heller, Elizabeth A. McMillion, Mark H. Heller, Karen A. Heller, Sally J. Heller, Nancy A. Heller, Ellen B. Heller, Mildred E. Heller and Barbara J. Heller ("Heller Defendants") and Louisiana Moran, Inc. ("Moran") and against Phillips Petroleum Company ("Phillips"), the lessee of the Cockrell and Heller Defendants and of Moran. The suit seeks to cancel the Defendants' mineral interests and lease[1] as to five parcels ("property in litigation") out of a much larger tract, the "52,000 acres." Vermilion Bay alleges that the mineral interests of the Defendants (and thus the lease of Phillips) have expired as to the five parcels because they are separated by navigable bodies of water from the rest of the 52,000 acres (or portions of it) on which there has been exploration and/or production within the ten years preceding suit. The five parcels involved are described in the Plaintiff's petition, as amended, as follows:
(a) All of that portion of Township 19 South, Range 26 East, Plaquemines Parish, Louisiana, bounded on the North by the north township line of Township 19 South Range 26 East, on the west by Bay *413 Batiste, on the east by Bay Sansbois and on the south by Bayou Dulac ["THE BAYOU DULAC AREA"].
(b) All of the several islands (separate tracts or parcels of land entirely surrounded by water) situated within Townships 19 and 20 South, Range 26 East, and within Township 20 South, Range 27 East, except those portions thereof, if any, that are lying within the tract which was conveyed to the Grande Ecaille Land Company, Inc. by Frank Fitzgerald, Trustee for Mt. Forest Fur Farms of America, Inc., on August 3, 1942, by act recorded at Conveyance Book 107, Folio 418 of the records of Plaquemines Parish, Louisiana and further except those portions thereof, if any, situated within Section 16 of Township 20 South, Range 26 East ["THE ISLANDS"].
(c) All of the lands situated in Township 19 South, Range 26 East, Plaquemines Parish, Louisiana, lying west and north of Lost Bayou, south of Bayou Dulac and east of Bay Batiste, except that portion of said land situated within Section 16, Township 19 South, Range 26 East ["THE LOST BAYOU AREA"].
(d) All lands lying within Township 20 South, Range 27 East, Plaquemines Parish, Louisiana, lying west of Lake Robinson (also known as Robinson Bay), Lake Washington and Garden Bay, except that portion thereof lying within the tract which was conveyed to Grande Ecaille Land Company, Inc., by Frank Fitzgerald, Trustee for Mt. Forest Fur Farms of America, Inc., on August 3, 1942, by act recorded at Conveyance Book 107, Folio 418 of the records of Plaquemines Parish, Louisiana, and further except that portion thereof lying west of Robinson Bayou and north of Billet Bay and further except that certain tract or parcel of land conveyed by Vermilion Bay Land Company to Maria T. Tesvich, Kuzma Tesvich, Jr. and Evo K. Tesvich by quitclaim deed recorded on April 27, 1982, in Conveyance Book 542, Folio 672 of the records of Plaquemines Parish, Louisiana, and that certain tract or parcel of land conveyed by Vermilion Bay Land Company to Tereza Yurichvic and Tony J. Tesvich by quitclaim deed recorded on April 27, 1982, in Conveyance book 542, Folio 667 of the records of Plaquemines Parish, Louisiana ["THE ROBINSON BAYOU AREA"].
(e) All of the lands situated within Township 20 South, Range 27 East, Plaquemines Parish, Louisiana, lying east of Bayou Huertes and south of Bayou deSuite and Bay au Fer ["THE BAYOU HUERTES AREA"].
The Plaintiff also seeks damages and attorney fees. No evidence relating to damages was adduced, so the Court will not make an award of damages. The Court will address the attorneys' fee matter below. The Court is aided in its task by lengthy Stipulations with 69 joint exhibits which reduced trial time and focused the dispute as to specific issues.

B. BASIC LEGAL PRINCIPLES CONCERNING NAVIGABILITY.
The legal principles dealing with navigability are well established. Navigability is not presumed; the burden of proof of navigability is upon the party asserting it. E.g., Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249 (1906). A body of water is navigable in law when it is navigable in fact. E.g., State v. Jefferson Island Salt Mining Co., 183 La. 304, 163 So. 145 (1935). The factual question turns on whether the evidence shows a body of water to be suitable by its depth, width and location for commerce. E.g., State v. Capdeville, 146 La. 94, 83 So. 421 (1919), cert. denied. A stream, to be navigable must be usable for commerce in its natural state or ordinary condition. E.g., Delta Duck Club v. Barrios, 135 La. 357, 65 So. 489 (1914); The Daniel Ball, 10 Wall 557, 19 L.Ed. 999 (1870).
Where title to the bed is concerned, 1812 is the pertinent date for determination of navigability. The Court's inquiry as to navigability "must therefore focus on the status of the [bayou] in 1812 ..." Ramsey River Road Property Owners v. Reeves, 396 So.2d 873, 875 (La.1981). Navigability after 1812, even if it occurs before severance of the land from the public domain, does not prevent private ownership of the bed of the stream; but, if subsequent navigability occurs naturally, such occurrence does give the public a servitude *414 or right of passage on the stream. Discon v. Saray, Inc., 262 La. 997, 265 So.2d 765 (1972); State v. Two O'Clock Bayou Land Co., 365 So.2d 1174 (La.App. 3d Cir.1979); Begnaud v. Grubb & Hawkins, 209 La. 826, 25 So.2d 606 (1946). See also, Vermilion Corporation v. Vaughn, 397 So.2d 490 (La. 1981) and previous opinion cited therein; Audubon Society v. White, 302 So.2d 660 (La. App. 3rd Cir.1974), writ denied.
There is, however, some authority which appears without discussion of the rationale to use the date of transfer out of the State to test navigability for title purposes. See Sinclair Oil & Gas Co. v. Delacroix Corporation, 285 So.2d 845 (La.App.1973). Thus, the Court will make factual findings as of that date as well.[2]

C. CHAIN OF TITLE.
The title of the parties is derived from the following much condensed chain of title:
(a) 1812: Louisiana was admitted to the Union.
(b) 1894: The Buras Levee District was created by Act 18.
(c) 1908: The Commission of the General Land Office rejected Louisiana's application under the Swamp Lands Grant Act and rules that the three-townships here involved were tidal overflow lands and thus the State acquired them through its inherent sovereignty under the equal footing doctrine (Stip.Ex. 1).
(d) 1910: The State's 1894 "donation" of lands to the Buras Levee District was amended to add "lands or parts of lands... that belonged to this State by virtue of its inherent sovereignty ... by Act 205.[3]
(e) 1914: The State formally conveys the lands in question to the Buras Levee District on July 24th. (Stip.Ex. 3).
(f) 1919: At a Sheriff's sale on February 1st, the Buras Levee District sold the land in question to J. Homer Jordan, Jr., Trustee. (Stip.Ex. 6).
(g) 1920: Patents were issued by the State to J. Homer Jordan, Jr., Trustee on May 1st, for the lands sold on February 1, 1919. (Stip.Ex. 7).
(h) 1927: J. Homer Jordan sells an undivided 127/150 to E. Cockrell[4] on March 29 (Stip.Ex. 46).
(i) 1927: E. Cockrell sells the undivided 127/150 to Mt. Forest Fur Farm on April 11, 1927, making a mineral reservation about which more will be said later (Stip.Ex. 47).
(j) 1927: J. Homer Jordan sells the other undivided 23/150 to W.T. Moran[5] on May 16 (Stip.Ex. 48).
(k) 1928: Moran sells the undivided 23/150 interest to Mt. Forest Fur Farm, reserving a mineral servitude on June 30 (Stip.Ex. 51).
(l) 1928: Mt. Forest Fur Farm transfers 1/10th of its mineral interest under the 127/150 to Moran (Stip.Ex. 52).
(m) 1942: A compromise (1942 Compromise) between the parties was entered into by the parties on June 30 (Stip.Ex. 56).
(n) 1942: Mt. Forest transfers the 10,000 acre tract in Township 20 South, Ranges 26 and 27 East to Grande Ecaille Land Company on August 3, 1942. (Stip.Ex. 57).
(o) 1975: A second compromise ("1975" Compromise") is entered into on April 28 (Stip.Ex. 68).

D. NATURE OF THE COCKRELL MINERAL INTEREST.
Before turning to navigability issues, certain contentions of the parties of general *415 application must be addressed. The first issue is the nature of the mineral right owned by the Cockrell Defendants. Plaintiff argues that the mineral right owned by the Cockrell Defendants is a mineral royalty accompanied by an executive right. La.Mineral Code art. 113. The Cockrell Defendants argue that their mineral right is a mineral servitude. La.Mineral Code art. 21. After considering the April 11, 1927 deed from Ernest Cockrell to Mt. Forest Fur Farm (in which the mineral right of the Cockrell Defendants was reserved), the 1942 Compromise, the 1975 Compromise and the evidence at trial regarding the contractual intent of the parties, the Court concludes that the mineral right owned by the Cockrell Defendants is a mineral servitude.
The Court will begin its analyses by reviewing the contractual language giving rise to the Cockrell Defendants' mineral interest. The original reservation by E. Cockrell in the 1927 deed of a 127/150ths mineral interest reads as follows:
This Vendor is vested with and specially retains for himself, his heirs and assigns and reserves from this sale, a perpetual royalty equal, to one-eighth of all minerals, including oil, gas and sulphur, which may be found in, under, upon or beneath the lands herein above-described, together with perpetual and exclusive rights to make and execute mineral leases on all or any portion of said lands for the exploration, development, production and marketing of any and all of said minerals, and also, including perpetual rights of ingress and egress solely for said purpose of exploration, development, production and marketing of said minerals, at all times, and likewise the use of so much of the surface of said premises as may be found necessary and convenient for the exploration development, production and marketing of said minerals which may be found and produced from said premises.
Besides conveying to Cockrell the right to grant mineral leases, the reservation gave Cockrell "... perpetual rights of ingress and egress solely for said purpose of exploration, development, production and marketing of said minerals, at all times, and likewise the use of so much of the surface of said premises as may be found necessary and convenient for the exploration, development, production and marketing of said minerals which may be found and produced from said premises." This language created a mineral servitude in favor of E. Cockrell.
The language in the 1927 deed has been the subject of much commentary by the courts and legal scholars. In Lenard v. Shell, 211 La. 265, 29 So.2d 844, 848 (1947), the Louisiana Supreme Court recognized that the 1927 reservation created a mineral servitude. It was also recognized as a mineral servitude in In Re Mt. Forest Fur Farms of America, 122 F.2d 232, 242 (6th Cir.1941). Professor Daggett also concluded that the 1927 deed created a mineral servitude in favor of E. Cockrell:
Since the right to explore upon which the royalty depended was reserved by the vendor [Cockrell], his reservations appears to have been a servitude plus a percentage of production from which without user would have lapsed in ten years. Mineral Rights in Louisiana, 260-261 (1940).
The Court must note, however, that the redactors of the Mineral Code in the Comment to Article 113, without analysis of the complete wording of the Cockrell Reservation, use it as an example of an executive right coupled with a royalty.
In any event, any ambiguity that may have existed in the 1927 reservation was removed by the 1942 and 1975 compromise Agreements. Article I of the 1942 Compromise Agreement provides as follows:
I.
The parties hereto recognize and agree that said Cockrell reservation remains intact and unaffected; and for the purposes of removing all controversy as to its meaning (without intending the following as a full enumeration) they recognize and agree that, among other rights:
(a) Under the provisions of the Cockrell Reservation, Cockrell was and still is vested with the exclusive rights, for himself, his heirs and assigns, to make and execute and fix the terms of, and, by agreements *416 with lessees, to amend, modify and supplement, leases for the exploration, development, production and marketing of the entirety of any and all minerals in, on, under or to be produced from the 52,000 Acres, as to the 127/150ths interest in the mineral rights in and to the 52,000 Acres (but not as to the remaining 23/150ths interest in such mineral rights), together with the right of ingress and egress and the use of the surface in connection therewith, and to retain as his exclusive property any and all bonuses or other considerations of every character which he has received or may receive for the making, amending, modifying, supplementing, renewing or extending of any and all of such leases, and that such rights on the part of Cockrell, his heirs and assigns, do not terminate as to any portion of the said property by a single use, or any number of uses, but remain in effect after the termination of any lease or leases in the same manner as they were created by the primordial title.
* * * * * *
(i) Neither Trustee, Mt. Forest, Moran, Heller, Guardian, nor any other person, firm or corporation claiming by, through or under them, or by, through or under Mt. Forest of Michigan, is vested with any mineral or royalty rights whatsoever in or to the 127/150ths interest in the 52,000 Acres save only for the overriding royalties expressly provided to be paid under the terms of this agreement, it being further understood that Mt. Forest and Trustee, by the quitclaim provided for in Paragraph II hereof and the other provisions of his agreement, have relinquished all interest which they have or might have in and to all (150/150ths) of the Leased Area [the 10,000 acres] save for the overriding royalties expressly provided for herein. (Emphasis added.)
(1942 Compromise Joint Stip.Ex. 56, p. 15).
Article I(a) grants to Cockrell the right to grant mineral leases and the right of ingress and egress and the use of the surface of the property for the exploration, development, production and marketing of any minerals from the property as to the 127/150ths interest of the Cockrells. Furthermore, Plaintiffs expressly stated in Article I(i) that they had no mineral or royalty rights whatsoever in the property except the overriding royalties provided for in the 1942 Compromise Agreement. The right to explore and develop the property as far as the 127/150th undivided interest is such a mineral right. This right must either have been vested in the Plaintiffs as the owner of the surface of the property (La. Mineral Code art. 6) or in the Cockrells as the owner of a mineral servitude (La. Mineral Code art. 21). Based on the language quoted above, one must conclude that this right was vested in the Cockrells as the owner of a mineral servitude covering an undivided 127/150th interest in the property.
The 1975 Compromise Agreement confirms and ratifies the rights vested in Cockrell by virtue of the 1942 Compromise Agreement. Article I, 1975 Compromise Agreement. The 1975 Compromise Agreement expressly says that other than the overriding royalties provided for in the 1942 and 1975 Compromise Agreements, plaintiffs shall have no mineral or royalty rights at all in and to the 127/150th undivided interest in the property (Stip.Ex. 68, p. 11). The right to explore for, produce and reduce minerals to possession and ownership vests in someone. The Cockrells owned this right as the owner of a mineral servitude covering the property.
The other evidence presented at trial shows that the contractual intention of the parties was that the Cockrell mineral interest was a mineral servitude. Vermilion Bay's 1989 Form 10-K filed with the Securities and Exchange Commission provides:
In April, 1985, the Registrant [Vermilion Bay] made demand on Louisiana Moran, Inc., the other owners of the mineral rights [Cockrell and Heller Defendants] and the mineral lessee [Phillips] for a release of the minerals underlying a portion of this acreage for failure to have commenced exploration within 10 years.... (Defendant's Exhibit CH-5).
It was established by the testimony of Mr. Patrick Moran, a former director of Vermilion Bay, that Mr. Sunday, the president of Plaintiff who was present throughout trial, *417 and Mr. Tracy, Vermilion Bay's trial counsel (in nonconfidential[6] communications), equated the Cockrell mineral interest to a servitude to which prescription was interrupted by exploration, i.e., drilling, rather than by production. Plaintiff did not try to challenge Mr. Moran's testimony. The Court finds that the Cockrell mineral interest, as modified by the 1942 and 1975 Compromise Agreements, is and has been at least since 1942 a mineral servitude.

E. THE TESTIMONY GENERALLY.
The Plaintiff called the following witnesses: two boatmen, Messrs. Navarro and Kiffe, and Ernest Easterly, an attorney on contract with the State as a special assistant attorney general who holds a Ph.D. in Geography. Dr. Easterly qualified as an expert witness in geography and its subdisciplines of historical geography, coastal geography, geographical (as opposed to geological) geomorphology and historical cartography. Dr. Easterly is, admittedly, the State's witness in its navigability suits. Dr. Easterly's testimony consisted of a review of many of the historical maps covering the areas of the water bottoms in issue and of newspaper and magazine articles and other writings relating to the area. Defendants called the following witnesses: Mr. Patrick Moran, whose testimony has been discussed; Mr. Fred Shutts, a deceased surveyor, by a deposition taken in 1973 to testify concerning a 1951 hydrographic survey of Lost Bayou. Mr. Fred Boyd, the deceased former chairman of Vermilion Bay by a 1974 deposition; Mr. Phillip Whittaker, a surveyor, to testify as to 1972 and 1990 hydrographic surveys of Lost Bayou; and Mr. Clifford Mugnier, a photogrammaticist, to provide mapping of Lost Bayou from aerial photography showing changes from 1945 through 1989. The Defendants also called Mr. Keith Fournier, a surveyor, to place the bottom hole location of the State Lease No. 2028 No. 23 Well, and Mr. John Hooks, a petroleum geologist, to describe the circumstances of drilling of that well.
Both Mr. Navarro and Kiffe said that they traversed Lost Bayou and the other bodies of water in either the middle 1920's (as to Navarro)[7] or early 1930's (as to Kiffe). The Court heard no testimony concerning navigation by these boatmen during 1920 or before.

II

AREA BY AREA DISCUSSION

A. THE BAYOU DULAC AREA.
With respect to Bayou Dulac, Dr. Easterly testified that the bayou was not depicted on the Gauld's map of 1798 nor on the other maps made shortly after 1812 by persons associated with General Andrew Jackson in his defense of New Orleans. It was, however, shown on the Hughes map (Exhibit P-10) and the Baker plat (Exhibit P-11) both of 1842, it then disappears from maps to reappear near the turn of this century. A newspaper article following the hurricane of 1893 relates that the Archbishop of New Orleans traveled through Bayou Dulac on a trip to visit the devastated area at Grand Isle and Cheniere Caminata. (Exhibit P-19)
As of 1927 the plaintiff's ancestor in title claimed ownership of the bed of Bayou Dulac on a map entitled "Property of Mt. Forest Fur Farm." (Defendant's Exhibit CH-3) and the Plaintiff is assessed with taxes covering its the bed to this day (Defendant's Exhibit CH-32).
The Court finds:
(1) The common chain of title of Plaintiff and Defendant includes sufficient portions of the bed of Bayou Dulac to render the area north of it contiguous with the area south of it where there has been user (Stip. ¶ V).
(2) The Plaintiff did not carry its burden of proving that Bayou Dulac was navigable in 1812 and, therefore, the Court finds that it was not navigable in 1812.
(3) Bayou Dulac was navigable at the time the property was severed from the public domain.

*418 B. THE LOST BAYOU AREA.
The 1842 Hughes map clearly shows that in 1842 there was no bayou where Lost Bayou now exists. The map shows a small stream ending in a marsh pond which does not divide the property in question[8] which Dr. Easterly identifies as the early Lost Bayou. He speculates that the upper half of Lost Bayou "could have" been formed by either the October 1893[9] or September 1915 Hurricane. He does not exclude other causes. He does not give an expert opinion when Lost Bayou became navigable. His only opinion was that based upon Kiffe's and Navarro's testimony, it was navigable in the late 1920's or early 1930's. Lost Bayou does not appear on any maps until air photography began to be used in the 1930's. Then it appears, originally, as a single, line stream.
Most telling as to later times, is the 1934 Hydrographic Survey made by the U.S. Coast and Geodetic Survey. The instructions to Lt. Wilder, in charge of the party which surveyed the Lost Bayou Area read
8. Complete new hydrographic surveys are to be made of all navigable inland waters as well as along the outer coast.... (Defendant's Exhibit CH-36).
This instruction is similar to that given to Capt. Hughes in 1842 to depict all streams capable of transportation of light infantry. Defendant's Exhibits CH-4 and 4A are copies of the plane table survey[10] by the 1934 survey party and Defendant's Exhibit CH-37 is the written report. Clearly the survey party found that Lost Bayou was not navigable then. All of the surrounding bayous, Bayou Dulac, Rattlesnake Bayou, Catherine Bayou, and Robinson Bayou, and the surrounding bays and lakes were shown on the survey and were sounded, but Lost Bayou was not. Soundings as little as one foot mean low water are recorded. Lost Bayou was not simply overlooked or lost by the survey party. Both the southern part and the northern parts of Lost Bayou which have substantial width and depth were shown on the plane table survey. The middle mile, the narrow and shallow part of Lost Bayou, is not shown. The parts of Lost Bayou shown were not shown with soundings. Public officers are presumed to have done their duty. Valvoline Oil Co. v. Concordia Parish School, 216 So.2d 702, 708 (La.App. 3rd Cir. 1968). See Loesch v. U.S., 645 F.2d 905, 921, 227 Ct.Cl. 34 (1981), dealing with the Corps of Engineers. The evidence presented by plaintiff not only does not establish navigability of Lost Bayou in 1812, 1914 or 1920, but fails to rebut the presumption that it was not navigable in 1934.
As with Bayou Dulac, Mt. Forest Fur Farm claimed title to Lost Bayou on the 1927 company map and Vermilion Bay pays taxes on it today. Also, in the so-called no prejudice agreements of 1954[11] Lost Bayou was omitted from the description of the "property in dispute," clearly indicating Vermilion Bay's then belief that the Bayou was not one which divided the ownership. This is reinforced when one understands that the surveyors in charge of the 1951 Hydrographic Survey which found a depth of +.1 feet Mean Low Gulf in the middle of Lost Bayou (Ex. CH-11), Rordam & Rordam, were also Vermilion Bay's surveyors (CH-39, Boyd Depo. pp. 57-58). The actual water depth unadjusted for tide (CH-7 Shutts Depo. p. 4) on that sounding cross section were between 1.0 and 1.6 feet deep in September of 1951. When adjusted to Mean Sea Level the depth would be .7 feet. (Whittaker test: 0 Feet MLG equals -.8 feet MSL).
Mr. Whittaker testified that between 1972 and 1990 Lost Bayou had generally grown in width about 1 foot per year and in depth about 1/10 foot per year. Mr. Shutts attributed the changes noted between 1951 and 1972 in the middle part of Lost Bayou to dredging for wells in the lower part of the bayou (CH-7 Shutts Depo. pp. 47-48). The *419 Court notes that the same sort of explanation of change was presented in Sinclair Oil & Gas Co. v. Delacroix Corp., supra, 285 So.2d at 851.
The Court finds with respect to Lost Bayou:
(1) The common chain of title of Plaintiff and Defendant cover sufficient portions of the bed of Lost Bayou to render the area west of it contiguous with the area east of it where there has been user (Stip. ¶ VI).
(2) The Plaintiff failed to carry its burden of proof and, therefore, the Court finds Lost Bayou did not exist in 1812 in a manner to cause non-contiguity and, further, to the extent that it existed was not navigable in 1812.
(3) The Plaintiff failed to carry its burden of proof and, therefore, the Court finds that Lost Bayou, if it existed, was not navigable when the property was severed from the public domain.
Although perhaps rendered moot by the foregoing, the Court also finds that prescription was interrupted by the drilling of the State Lease No. 2028 Well No. 23. The uncontradicted testimony of Mr. Keith Fournier established that the well was bottomed under the land in question as it existed in 1951 and 1975.[12] Based upon the also uncontradicted testimony of Mr. John Hooks, the defendants' geological witness, the Court finds that the drilling of the well was a good faith operation to discover and produce minerals according to each criterion set forth in Mineral Code Article 29 (La.R.S. 31:29). The Court therefore finds separate user of the defendants' mineral servitudes as to the land lying west of Lost Bayou. The Court further finds that it is unnecessary under the clear wording of Mineral Code Article 37 (La.R.S. 31:37) for Vermilion Bay as surface owner, to sign a voluntary unit. Therefore production from the LW 23 RA VUA and the LW 26 RA VUA units, although the producing wells are on State Lease 2028, also interrupts prescription as to that part of the lands in question included within those units.[13]

C. THE ISLANDS.
The Islands are located principally in Barataria Bay, Lake Grande Ecaille, and Bay Batiste, in Townships 19 and 20 South Range 26 East and two islands being located in Lake Robinson in Township 20 South Range 27 East.
There has been no contention by Defendants that the major bays were not navigable in 1812 and the evidence suggests Lake Robinson was as well.
With respect to the Islands, the Court finds Barataria Bay, Bay Batiste, Lake Grande Ecaille, and Lake Robinson:
(a) To have been navigable in 1812.
(b) To have been navigable at the date the lands in question were severed from the public domain.
The Court further finds that there has been user of the defendant's mineral rights as to that part of the island included within the boundaries of the 15 Sand West Unit according to Unit Agreement recorded in Conveyance Book 496, Folio 724, records of Plaquemines Parish, Louisiana.[14]

D. THE ROBINSON BAYOU AREA.
As to this area the Defendant conceded at the outset that their title (and that of plaintiff) does not cover the beds of Robinson Bayou or Lake Robinson as shown on the Township Plats and that they rely upon production and exploration from the 10,000-acre tract, the surface of which is now owned by Grande Ecaille Land Company, to hold their mineral interests. In this connection, they filed certified copies of Department of Conservation records showing production *420 information, on several wells located on the 10,000-acre tract from 1951 forward (Defendant's Exhibit CH-30) and the well file of the LLOG-Cockrell Moran No. 1 Well, a dry hole drilled on the 10,000-acre tract in the 1980's (Defendants Exhibit CH-31). The plaintiff contends that production from or exploration on the 10,000 acres cannot serve to interrupt prescription.
At this point, it is necessary to digress. As noted above, the 1942 Compromise was entered into by the parties and then over a month later the 10,000-acre tract was transferred by Mt. Forest to Grande Ecaille Land Company. This sequence of events is important because the law is clear that action by the surface owner will not serve to divide the mineral rights, here the Post 1942 Compromise mineral rights, of the Defendants.[15] To avoid any question whether the 1975 compromise affected this question, Defendants have shown production from 1951 forward. This, therefore, clearly establishes user of the pre-1972 rights. The Court notes that while Dr. Easterly testified that he thinks Billet Bay (lying within the 10,000 acres) was navigable, that water body, historically, did not completely sever the 10,000 acres north to south and wells to the west of Billet Bay are, therefore, user of property to the east of Billet Bay.
The Court, therefore, finds user of that part of this contested parcel lying west of Robinson Bayou and no user of that part lying east of Robinson Bayou.

E. THE BAYOU HUERTES AREA.
The Plaintiff contends that the water course north from the Gulf up Bayou Huertes east through Bayou deSuite and Bay Au Fer to Grand Bayou is a navigable course of commerce.
Of the early mapping, all but an 1834 map show Bayou Huertes either ending or connecting with Grand Bayou south of the south line of Township 20 South, Range 27 East, and thus they do not show a severance of the property in litigation. The 1834 map shows Bayou Huertes proceeding northward and playing out in the marsh (as it does today) with no Bayou deSuite, Bay Au Fer connection to Grand Bayou. The configuration shown by that map may sever Township 20 South, Range 27 East east from west. However, it does not render the property in litigation non-contiguous from the tract in the northeast corner of the township on which the Peltex-Cockrell Foundation No. 1 and 1-A Wells which were drilled in the extreme northeast corner of the township which connect north to south. It takes the Bayou deSuite, Bay au Fer connection to do that.
Major Payne's oyster survey of 1915 for the Conservation Commission is most informative in this regard. He shows Bayou Huertes connecting with Bay Au Fer and Grand Bayou (Exhibit P-22). However, his field notes clearly identify the only two connections to Grand Bayou as "canals." Exhibit P-23. Dr. Easterly identified this reference as meaning "man made" or, at least, "man channelized." The primary definition of "canal" is: "an artificial water course ..." Webster's, New 20th Century Unabridged. Thus, the course of commerce repeatedly emphasized by Plaintiff in the testimony of Kiffe and Easterly is not based on the natural state of the water courses. Accordingly, the Court finds with respect to Bayou Huertes, Bayou deSuite, Bay au Fer and Grand Bayou:
(1) Plaintiff's and Defendant's chain of title crosses Bayou deSuite and Bay Au Fer north to south rendering the Bayou Huertes Area contiguous to part of the 52,000 acres where there has been user (Stip. ¶ IX).
(2) The Plaintiff has not borne its burden of proof and the Court finds that the said course was not navigable in 1812.
(3) That the Plaintiff has not borne its burden of proof and the Court finds that the said course was not navigable when the lands were severed from the public domain.

III

EXCEPTIONS

1. No Right or Cause of ActionCollateral Attack
The Defendants filed exceptions of no right or cause of action and a motion in limine *421 objecting to evidence of navigability of Bayou Dulac, Lost Bayou and Bayou Huertes/Bayou/Bay deSuite on the ground that the Plaintiff could not collaterally attack the patents[16] under which the Plaintiff and Defendants jointly hold. The Defendants also contend by the exceptions that the Plaintiff cannot attack the title of their common ancestor in title, J. Homer Jordan, to what is now the beds of those bayous. The Defendants rely principally on Harrison v. Grandison, 51 F.Supp. 768 (E.D.La.1943), and Louisiana cases cited therein, for the first proposition and upon Civil Code Article 532 and the case law preceding it for the second. The Court overruled the motion in limine and permitted evidence as to navigability of the bayous. The Defendants' objection was made continuing as to that evidence. At the close of the plaintiff's case, Defendants brought up the exceptions in a Motion for Involuntary Dismissal. The Court overruled the exceptions at that time and again at the end of the Defendants' case principally because the plaintiff contends that the patents are absolute nullities under Gulf Oil Corp. v. State Mineral Board, 317 So.2d 576 (La.1975). Since the factual findings herein moot the exceptions, the Court need not reopen its decision.

2. Exceptions of Prescription/Peremption.
The Defendants also filed exceptions of prescription and peremption based on the Act 66 of 1912. The Court overrules such exceptions on the authority of Gulf Oil Corp. v. State Mineral Board, supra.

3. Exception of Res Judicata.
Defendants also filed a peremptory exception of res judicata, claiming that the 1975 Compromise Agreement bars plaintiff from asserting non-contiguity based upon these waterways, except as to their navigable status after April 28, 1975. Phillips Petroleum Company makes a similar claim in its answer to the petition regarding the effects of the 1942 Compromise Agreement. Although those compromise agreements became judgments in the proceedings then pending at Docket Nos. 1190 (in the case of the 1942 Compromise Agreement) and 14684 (in the case of the 1975 Compromise Agreement) of the 25th Judicial District Court, Louisiana law distinguishes between the res judicata effect of consent judgments and other final judgments. A consent judgment is in effect a bilateral contract between the parties which gets its binding force from the consent which the parties give, rather than from adjudication by a competent court. See Ritchey v. Azar, 383 So.2d 360 (La.1980); Chaisson v. Chaisson, 454 So.2d 890 (La.App. 4th Cir.1984); Succession of Simmons, 527 So.2d 323 (La.App. 4th Cir.1988).
Compromises lawfully regulate only those differences which appear clearly to be comprehended by the parties and do not extend to differences which the parties never intended to include in them. LSA C.C.Art. 3073; Durbin v. Cockerham, 442 So.2d 634 (La. App. 1st Cir.1983); Townsend v. Townsend, 421 So.2d 969 (La.App. 3rd Cir.1982); see also Succession of Magnani, 450 So.2d 972 (La.App. 2d Cir.1984), noting "... any resolution of the issue herein must be based upon our determination of what the parties could reasonably have intended by the language employed in the compromise agreement...." Accordingly, only those issues that the parties clearly intended to resolve, did resolve and could lawfully resolve in the language of the compromise agreements may be precluded by the effects thereof. Although defendants cite language in the agreements noting the existence of disputes regarding the contiguity or non-contiguity of portions of the 52,000 acres, nothing in the language of these instruments reflects an agreement or understanding of the parties regarding the navigability of disputed bays and bayous involved in this litigation and/or the contiguous or non-contiguous status of the tracts involved in this litigation. What is more important, Louisiana public policy considerations inherent in the system of prescription and embodied in the non-contiguity rule precluded *422 the parties from lawfully contracting in the compromise agreements regarding the contiguity or non-contiguity of the lands affected by the mineral rights of the defendants in this litigation or of their predecessors in title. See La.R.S. 31:73, 103 and the comments thereunder.
Even the structure of the compromise agreements reflects an awareness of the parties regarding such limitations upon their contractual freedom. See, for example Paragraph I(e) and (f) of the 1942 Compromise Agreement and Paragraph III(d) and (e) of the 1975 Compromise Agreement.
The Court accordingly finds that the parties to the 1942 and 1975 Compromise Agreements did not intend to and could not lawfully contract regarding the issue of the contiguity or non-contiguity of lands within the 52,000 acres, including those lands involved in this proceeding, and that the claims of plaintiff in this litigation are not precluded by the effects thereof or of res judicata.

IV

DAMAGES AND ATTORNEY FEES
Plaintiff has abandoned its claim for damages. It has, however, submitted a claim for nearly $250,000.00 in attorney's fees and expenses unallocated to any of the five parcels making up the property in litigation. The Court will make no award for attorney's fees. Mineral Code articles 206-208 provide:
§ 206.
A. Except as provided in Paragraph B of this Article, when a mineral right is extinguished by the accrual of liberative prescription, expiration of its term, or otherwise, the former owner shall, within thirty days after written demand by the person in whose favor the right has been extinguished or terminated, furnish him with a recordable act evidencing the extinction or expiration of the right.
B. When a mineral lease is extinguished prior to the expiration of its primary term, the former lessee shall, within ninety days after the extinguishment, record an act evidencing the extinction or expiration of the lease in the official records of all parishes wherein the lease is recorded.
§ 207.
If the former owner of the extinguished or expired mineral right fails to furnish the required act within thirty days of receipt of the demand or if the former lessee of a mineral lease fails to record the required act within ninety days of its extinguishment prior to the expiration of its primary term, he is liable to the person in whose favor the right or the lease has been extinguished or expired for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit.
§ 208.
The former owner of a mineral right other than a mineral lease is not liable for damages or attorney's fees under Article 207 if there is a good faith dispute as to whether prescription has accrued, the term of the right has expired, or it has been otherwise extinguished.
There is surely a good faith dispute here. Also, the good faith dispute extends protection to Phillips, the mineral lessee of Bayou Dulac, Lost Bayou and Islands since its rights are dependent upon those of Cockrell, Moran and Heller. The exclusion of lessees from protection in Article 208 is intended to and does apply when the lease has itself expired, not when the lessee's rights are contended by a person not his lessor to have terminated because of the termination of the rights of the mineral interest owner who granted the lease.

V

SUMMARY
In summary, the Court finds:
(a) For the Defendants as to the Bayou Dulac Area.
(b) For the Plaintiff as to the Islands except that Island where there was separate user.
(c) For the Defendants as to the Lost Bayou Area.
(d) For the Plaintiff as to all of that part of the Robinson Bayou area lying east of Robinson Bayou and for the Defendants as to that part of the area lying west of Robinson Bayou.

*423 (e) For the Defendants as to the Bayou Huertes Area.
(f) For the Defendants with respect to Plaintiff's claim for damages and attorney fees.
THUS DONE AND SIGNED in Chambers at Pointe-a-la-Hache, Louisiana, this December 14, 1992.
 /s/ M.E. KIRBY
 Judge
NOTES
[1] The defendants comprise parties referred to generally as the Cockrell Defendants, the Heller Defendants, Louisiana Moran Incorporated and Phillips Petroleum Company. Phillips claims mineral rights in portions of the disputed lands as a lessee and sublessee of mineral rights claimed by the other defendants in this litigation. These leases are referred to in the petition as the Mecom Lease and the Mecom Sublease. The exact identity of the defendants appears in a subsequent portion of this opinion. For brevity's sake the defendants shall be referred to collectively as "defendants" unless specifically named.
[1] The Phillips Lease actually covers only the first three of the five parcels.
[2] The Plaintiff apparently uses 1914, the date the State formally conveyed the property to the Levee Board, as the date of severance. The patents were issued in 1920. Findings herein as of the date of severance are as of 1914 and as of 1920.
[3] The Buras Levee District was unique among levee districts in receiving sovereignty lands. Thus, one of the title problems involved in many "navigability" cases, i.e., the question of whether the donation from the State to the Levee District could possibly include navigable waterbottoms since the grant to the other districts was by its terms limited to swamp and overflow lands, is not here present.
[4] The Cockrell Defendants are the successors to E. Cockrell.
[5] Moran and the Heller Defendants are the successors to W.T. Moran.
[6] See Defendants' Exhibit CH-12, minutes of director's meeting.
[7] The Court notes that Mr. Navarro's entire testimony is suspect. His statements concerning traversing Lost Bayou in a large boat called the Ex-Marine are not believable.
[8] Dr. Easterly, apparently, was of the opinion that a small stream going into an isolated "duck pond" on a single tract meets the test of navigability. The Court rejects that contention.
[9] We note that the Archbishop did not use any "short cut" provided by Lost Bayou during his trip to Cheniere Caminata after the 1893 Hurricane.
[10] The air photography was not available until later (Easterly Test.).
[11] Defendant's Exhibits CH-33 through 35.
[12] Those are the critical dates under the so-called "Freezing Statute," La.R.S. 9:1151. The offsetting State Lease to the 1951 Lease from the Defendants to Phillips covering the Lost Bayou area is State Lease 2028 which was dated September 10, 1951, and was also taken by John Mecom, Phillips' ancestor in title. (Exhibit P-2, item 9). See State v. Placid Oil Company, 274 So.2d 402 (La.App. 1st Cir.1972), reversed on other grounds, 300 So.2d 154 (La.1974).
[13] See also Kramer & Mathew, The Law of Pooling and Unitization, § 20.02(3)(b) (3rd Ed.1990).
[14] Stipulation ¶ VII.A.
[15] E.g., Civil Code Art. 747 (formerly Art. 776); Mineral Code art. 65 (La.R.S. 31:65).
[16] Those patents on their face and when read in conjunction with the Payne Plats approved by Governor Sanders convey connecting portions of the beds of those Bayous. This is also demonstrated by comparing the exhibits to Plaintiff's Petition with the patents and the process verbal of the sale. (Stip. exs. 45, 41, 40, 39, 36, 20, 17, 16, and Ex. 6.).