662 So.2d 773 (1995)
The PLAQUEMINES PARISH GOVERNMENT
v.
GETTY OIL COMPANY, et al.
No. 94 CA 1634T.
Court of Appeal of Louisiana, First Circuit.
May 5, 1995.
Opinion Granting Rehearing for Limited Purpose September 7, 1995.
Ernest R. Eldred, Larry D. Dyess, Baton Rouge, for plaintiff-appellant.
Louise V. White, New Orleans, for defendant-appellee Exxon.
John D. Fitzmorris, New Orleans, for defendant-appellee Texaco Production, Inc.
H. Hampton Carver, New Orleans, for defendant-appellee Chevron U.S.A., Inc.
William S. Johnson, Angola, in pro per.
J. Carter Wilkinson, Baton Rouge, for defendant-appellee Getty Oil Co.
J. Clayton Johnson, Baton Rouge, for intervenor-appellee Robert L. Lobrano, et al.
Brian Guillot, New Orleans, for defendant-appellee William S. Johnson Trust.
Chester A. Eggleston, Port Sulphur, for Curator-Ad-Hoc for absent defendants.
John A. Gordon, New Orleans, for defendants The Clayton Foundation for Research, et al.
William F. Pipes, Jr., Monroe, for defendants Mrs. Carol L. Parsons, et al.
*774 James A. Barton, III, New Orleans, for defendants Erwin W. Smith, Jr., et al.
W. Eric Lundin, III, Belle Chasse, for Curator-Ad-Hoc for Absent Defendants Deanok, Inc. and Russell D. Morris.
Charles B. Mayer, New Orleans, for defendants Alice H. Lynch, et al.
India Morris Bradley, Lorton, VA, for defendant.
Before WATKINS and FOGG, JJ., and TANNER,[1] J. Pro Tem.
*783 Before WATKINS and FOGG, JJ., and TANNER,[1] J. Pro Tem.
WATKINS, Judge.
The issue in this appeal is whether leases held by the defendant oil companies are "alive" or whether, because of the expiration of the mineral servitudes held by their alleged grantors of the leases, parts of the leases have expired.
This lawsuit involves various claims to mineral rights in certain lands that were formerly a part of West Bay in Plaquemines Parish, Louisiana. Plaintiff Plaquemines Parish Government (hereinafter "Parish") is the successor in title to the Buras Levee District and, as such, is the undisputed owner of 100 percent of the land involved and 50 percent of the mineral rights.
In 1987, the Parish filed suit to assert, among other things, that the other 50 percent of the mineral rights, which at one time was owned by Emile J. Rose and Robert L. Morris, Jr., reverted to the Parish free of the mineral leases granted. The Parish named as defendants: Getty Oil Company; Texaco Producing, Inc.; Texaco, Inc.; Exxon Corporation; and Chevron U.S.A., Inc. (hereinafter "oil companies"). Thereafter, an intervention was filed by the following parties: Robert L. Lobrano; Marilyn Polansky Lobrano; Clayton J. Borne, Jr.; Doris Mace Borne; Whitney National Bank, and Robert L. Lobrano, as co-trustees of the Robert J. Lobrano Testamentary Trust (hereinafter "Lobranos").
All parties moved for summary judgment on the grounds that all issues raised were legal, not factual, questions. The district court granted a partial summary judgment, which was in favor of the defendants and the intervenors, and the court denied the motion of the Parish. The Parish perfected an appeal challenging the judgment granted and applied for a writ to challenge the denial of its motion. For the sake of judicial efficiency, we heard oral argument on all issues on the same day, and we render this decision affirming the trial court's judgment and a companion decision denying the writ.

BACKGROUND
The history of the property involved in this litigation is important to an understanding of the legal issues. The Parish provided the lower court and this court with a listing of significant dates and events.
In 1812 West Bay was a navigable body of water owned by the State of Louisiana by its inherent sovereignty ("sovereignty lands"). By 1836 a crevasse, known as "the jump," formed in the vicinity of Venice, Louisiana, on the banks of the Mississippi River; silt filled in parts of West Bay. Although "dry land" was created, the area was still legally "sovereignty lands."
In 1849 and 1850, Congress authorized the transfer from the United States to the State of Louisiana of public lands defined as "swamp and overflow lands." By Act 18 of 1894, the Louisiana Legislature created the Buras Levee District (hereinafter "District") and authorized the State to transfer to the District "swamp lands" acquired from the United States. Although the transfer of "sovereignty lands" was not authorized by the legislation, nevertheless, in 1896 the District transferred title to some "sovereignty lands" to James D. Lacey.
By Act 205 of 1910, the Louisiana Legislature authorized the State to transfer to the District "sovereignty lands" within the district. By deed dated May 22, 1928, and recorded on May 25, 1928, the State transferred to the District certain lands in dispute in this litigation; the deed reserved all navigable *775 water bottoms to the State, thus making the land transferred a group of noncontiguous tracts. All of the jurisdiction, property, rights, and powers of the District are now vested in the Parish.
The successors to Mr. Lacey were Mr. Rose and Mr. Morris, who on April 12, 1928, granted a mineral lease to Gulf Refining Company of Louisiana (hereinafter "Gulf"). Thereafter, on May 23, 1928, by an "Act of Confirmation," the District ratified the 1896 transfer to Mr. Lacey.
However, by September of 1928, the District's board of directors changed its stance and authorized a lawsuit seeking to set aside and nullify the Act of Confirmation. On September 13, 1928, the District granted a mineral lease to Robert J. Lobrano, on part of the same lands previously transferred to Mr. Lacey and referenced in the Act of Confirmation. The District filed suit against Mr. Rose, Mr. Morris, and others on February 15, 1929, in the Twenty-Fifth Judicial District Court for Plaquemines Parish. Judgment in favor of the District was rendered, and the defendants appealed.
While appeal was pending in the Louisiana Supreme Court, the parties entered into a settlement and compromise, which was evidenced by four documents. First, an agreement of compromise contained the provisions that the parties agreed to include in the court's decree. Second, a consent decree based upon the provisions of the agreement was rendered by the Louisiana Supreme Court. The principal provisions of the consent decree were declarations that 100 percent of the land (hereinafter "Compromise Area") was owned by the District, and that the mineral rights were owned 50 percent by the District, 25 percent by Mr. Rose, and 25 percent by Mr. Morris. Third, the Lobrano lease was recognized as valid in the consent decree, and Mr. Lobrano assigned it to Gulf; the lease to Gulf by Mr. Rose and Mr. Morris was declared invalid. Fourth and finally, an overriding royalty agreement in favor of Mr. Lobrano was executed in consideration of the assignment of his lease to Gulf.

CURRENT LITIGATION
In 1987 the Parish filed the instant lawsuit to have the Rose-Morris mineral "servitudes" on the Compromise Area and the leases with which they were burdened declared expired[2] (hereinafter "Expired Servitude Areas"; see "Chart," Appendix A).
Regarding the servitudes, the Parish alleged that the Rose-Morris mineral rights declared in the 1930 consent decree were mineral servitudes subject to the 10-year liberative prescription of nonuse. Next, the Parish cited the rule that a mineral servitude owner may not create a single servitude on noncontiguous tracts; instead, there are as many servitudes as there are tracts. See LSA-M.C. art. 64. Therefore, when Mr. Rose and Mr. Morris reserved their mineral interests in the 1930 consent decree, they created several servitudes on noncontiguous tracts. Although there was production on some of the tracts of the Compromise Area subject to the Rose-Morris mineral servitudes, the Parish claims there also were noncontiguous tracts separated by the various waterways cutting through the area on which there was no production, the alleged Expired Servitude Areas that reverted to the Parish 10 years after the compromise agreement or in 1940. The Parish concludes that the granting of a lease by Mr. Rose and Mr. Morris on several noncontiguous mineral servitudes and the drilling of a well on one tract did not preserve the mineral servitude or the lease on the other noncontiguous tracts. Thus, according to the Parish, the reversionary mineral interests are not subject to the leases by any action of Mr. Rose and Mr. Morris.
Regarding the leases, the crux of the Parish's argument is that the Louisiana Constitution of 1921 prohibited the District from alienating its mineral rights. See La. Const. of 1921 art. IV, § 2. Therefore, the Parish asserts, in 1930 the District could not "create" servitudes in favor of Mr. Rose and Mr. Morris. Furthermore, the law of compromise of litigation involving title to property, the Parish points out, does not entail a conveyance *776 or the conferring of new rights, but merely recognizes rights the parties claim to have. Because the consent decree did not convey any rights but merely recognized the Rose-Morris pre-existing mineral interest, the Parish reasons, the District could not have granted a mineral lease to Mr. Lobrano two years earlier covering 100 percent of the minerals, and the Rose-Morris interests could not have been subject to the Lobrano lease until 1930 when the consent decree was rendered. Thus, according to the Parish, the reversionary mineral interests are not subject to the leases by any action of the District.
The defendant oil companies and the intervenors filed motions for partial summary judgment, based on the proposition that the leases on 100 percent of the minerals were "alive" either because the consent decree made the Rose-Morris interests subject to the Lobrano lease or because the 1928 lease to Lobrano was for 100 percent of the minerals. The trial court did not consider the movers' arguments regarding warranty and the after acquired title doctrine; instead, the trial court based its judgment on an interpretation of the 1930 consent decree. The trial court did not reach the merits of the case, specifically whether there were mineral servitudes on noncontiguous tracts that reverted to the Parish. The partial summary judgments affect the amount of money the Parish will be entitled to only if it proves that the servitudes expired and that now the Parish is entitled to receive revenues formerly paid to the Rose-Morris interests.[3]
In his written reasons for judgment, the trial judge outlined the pertinent provisions of the consent decree, as follows:
Paragraph 2: The Buras Levee District is declared to be the owner with full title free of any claims and demands by Rose, Morris, Lobrano, or Gulf, except as is set forth in the consent decree to the property [land] described in that paragraph.
Paragraph 3: The Rose and Morris lease[s] to Gulf granted on April 12, 1928, is [sic] declared to be null, void, and of no effect, insofar as, but only insofar as, they affect or purport to affect or cover or include the lands described in the second paragraph of the decree.
Paragraph 6: The lease by the Buras Levee District to Lobrano dated September 13, 1928, and the assignment of that lease to Gulf, are recognized as valid, legal and binding on all parties. There is added to that lease a provision by which Gulf, upon the discovery of oil on the land, is obligated to drill as a prudent operator for the benefit of both the grantor and grantee.
That added provision further provides that if Gulf fails to reasonably develop the lease after the discovery of minerals, "such failure shall entitle the grantors to an action for damages only and not to the cancellation or termination of the rights of grantee under this lease." Gulf is then obligated to begin operations for the drilling of a well within ninety days of the date of the consent decree.
Paragraph 7: Rose and Morris are each recognized as the owner of an undivided one-quarter interest in any minerals produced from the Buras Levee District land which is the subject of the consent decree.
Paragraph 8: The lease to Lobrano and the assignment to Gulf [are] made binding upon and ... made to include and cover the one quarter interest in minerals owned by Rose and Morris as is established by Paragraph 7. All rentals and royalties payable under the lease are to be paid direct[ly], one-quarter to Rose, one-quarter to Morris, and one-half to the Buras *777 Levee District, each of the three parties "being considered, to the extent of his or its interest as aforesaid, as grantor of said lease."
Paragraph 10: Except as is modified in the decree, the lease by Rose and Morris to Gulf dated April 12, 1928, is recognized as binding upon the parties thereto but only affecting the interest which Rose and Morris had on April 12, 1928. It provides that operations under the Lobrano lease are to constitute operations under the Rose and Morris lease to Gulf without any further operationsoperations under the Lobrano lease will maintain the Rose and Morris lease to the same extent as if made under the April 12, 1928 lease. If Gulf elects to maintain the Lobrano lease without drilling, then the rental due Rose and Morris is fixed at a higher rental, and the payment of the rental will also have the effect of maintaining ("as herein modified") the Rose and Morris lease to Gulf.
Paragraph 11: The election and obligation by Gulf to drill a well under the Lobrano lease is considered as obligating Gulf to pay the rental due Rose and Morris and that obligation or the payment within ninety days of the consent decree to Rose and Morris will maintain in full force and effect the Rose and Morris lease to Gulf, "as hereinabove modified."
Thereafter, the trial court rendered judgment, which we quote in pertinent part:
IT IS ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment filed by the Plaintiffs, the Plaquemines Parish Government, be and the same is hereby denied.
IT IS FURTHER ORDERED that the Motions for Partial Summary Judgment filed by [the defendant oil companies and the intervenors] are each hereby granted, and judgment is rendered herein decreeing that the oil, gas and mineral lease dated September 13, 1928, executed by the Board of Commissioners for the Buras Levee District, as lessor, in favor of Robert J. Lobrano, as lessee, ... has not terminated as to the areas described by the Plaintiffs (sic) as the "Expired Servitude Areas" in Paragraph 24 of the original petition filed herein, inasmuch as this Court finds that the aforesaid lease is in full force and effect as to the full 100% mineral interest in the Expired Servitude Areas and is not dependent upon the continued existence of the Rose and Morris servitudes, as described in Paragraph 18 of the original petition filed herein.
The trial judge provided written reasons for judgment in which he stated that in the consent decree, the District, as owner of the land, "created" the Rose-Morris servitudes. He concluded that because the Lobrano lease was originally granted by the District prior to the creation of the servitudes, the mineral lessees' rights and obligations were unaffected by the expiration of the servitudes.
On appeal, the Parish urges the following errors in the trial court's judgment:
A. La. Const. art. IV, § 2, 1921
La. Const. art. IV, § 2, 1921 prohibited the Buras Levee District from alienating its mineral rights. Therefore, it was error for the Trial Court to hold that the Buras Levee District created the mineral servitudes in favor of Rose and Morris in 1930.
B. Consent Decree Did not Confer New Rights
The law is that a compromise of litigation involving title to property does not entail a conveyance or the conferring of new rights, but merely recognizes those rights the parties claim to have; therefore, it was error for the Trial Court to hold that the Parish (Buras Levee District) created the mineral servitude in favor of Rose and Morris.
C. Compromise Agreement and Consent Decree
Since the Compromise Agreement and Consent Decree did not convey any rights from the Levee District to Rose and Morris, but merely recognized the pre-existing mineral interest they claimed, it was error for the Trial Court to hold that, in 1928, the Buras Levee District granted a mineral lease to Lobrano covering one hundred (100%) percent of the minerals and that the Levee District created mineral servitudes in favor of Rose and Morris subject to the Lobrano Lease.

*778 D. Requirement of Drilling Activity
The law is that a mineral servitude owner granting a lease on noncontiguous tracts must have drilling activity on each tract within ten (10) years or the servitude will expire, together with the lease on those tracts which did not have drilling activity. Therefore, it was error for the District Court to hold that the lease granted by Rose and Morris on their recognized servitudes would not expire on termination of their servitudes.
E. Res Judicata, Judicial Estoppel and Estoppel by Judgment
The Trial Court erred in applying res judicata, judicial estoppel and estoppel by judgment in this case because the question at issue in this case is the interpretation of a Consent Decree made in 1930, and the effect of the termination of mineral servitudes ten (10) years after the 1930 Settlement. The Trial Court erred because these issues could not have been an issue in the Consent Decree; therefore, res judicata, judicial estoppel or estoppel by judgment are not applicable.
Assuming for the sake of argument that the Parish is correct in its first three assignments, claiming that the Lobrano lease did not attach to the Rose-Morris mineral servitude until 1930, nevertheless, the judgment must be affirmed because the Parish's fourth assignment of error, which forms the crux of its argument, is a misstatement of the law. The Parish states that both the servitudes and the leases on noncontiguous tracts will expire for nonuse. Although servitudes expire for nonuse, the Parish's conclusion that leases thereon also expire is not supported by the statutes and the jurisprudence.
The Parish concedes that a person owning land and minerals may grant a lease on noncontiguous tracts and that drilling anywhere on the lease will hold the whole lease on all tracts. See LSA-M.C. art. 114; Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958).
LSA-M.C. art. 114 provides:
A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. A single lease may be created on two or more noncontiguous tracts of land, and operations on the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened.
Although not cited by the Parish, the provisions in LSA-M.C. art. 115 are pertinent. Article 115 provides, in part:
A. The interest of a mineral lessee is not subject to the prescription of nonuse, but the lease must have a term. Except as provided in this Article, a lease shall not be continued for a period of more than ten years without drilling or mining operations or production. Except as provided in this Article, if a mineral lease permits continuance for a period greater than ten years without drilling or mining operations or production, the period is reduced to ten years.
In Reagan, the court held that the 10 year liberative prescription of nonuse did not apply to a mineral lease. In that case Holt, a landowner, granted a mineral lease over several thousands of acres of land, including two 40-acre tracts that he later sold to Reagan and Jones,[4] reserving the minerals to himself. No mineral use occurred on the two 40-acre tracts, which were noncontiguous to the landowner's tracts upon which there was development. Thus, the mineral servitude reserved by the landowner when he sold the two tracts was extinguished by nonuse.
However, the court held that production on one part of the tract leased by the original landowner maintained the lease on the entire tract, including the two 40-acre tracts. Thus, the "new" landowners, Reagan and Jones, who received the reversion when the servitudes were extinguished, received the mineral interests restricted by and subject to the terms of the mineral lease granted by their ancestor in title. The majority of the court pointed out that the new landowners had an adequate remedy: to require the lessee either to develop the properties or *779 to release them from the effect of the mineral lease. The court stated:
It is the established jurisprudence that full development of the property on which a mineral lease is given is implicit in the lease contract, it being an implied condition of every lease that the lessee will test every part of the land subject to it with reasonable diligence or suffer a partial cancellation. [Citations omitted.]
105 So.2d at 214. Thus, it is immaterial, under Reagan, that the tracts of land in the instant case were noncontiguous if we view the Lobrano lease as covering 100 percent of the minerals in 1928, when the lease was granted by the District as landowner.
Nevertheless, the Parish argues that the District could not lease 100 percent of the minerals in 1928, because the District did not own 50 percent of the minerals. Thus, the Parish reasons, Mr. Rose and Mr. Morris became lessors in 1930 when the Lobrano lease was recognized in the consent decree. Furthermore, the Parish reasons, because Mr. Rose and Mr. Morris were mere servitude owners, not landowners, production by the lessee on one tract did not keep the lease "alive" as to the Rose-Morris 50 percent interest in the noncontiguous tracts, the Expired Servitude Area.
The Parish maintains that a person owning only a mineral servitude who grants a mineral lease on several noncontiguous tracts must have drilling operations on each tract within 10 years to prevent the servitude and the lease from expiring for nonuse on the separate tracts. As authority for this proposition, the Parish cites LSA-M.C. arts. 27, 64 and 73, and Lee v. Giauque, 154 La. 491, 97 So. 669 (1923).
LSA-M.C. art. 27 provides in pertinent part:
A mineral servitude is extinguished by:
(1) prescription resulting from nonuse for ten years....
LSA-M.C. art. 64 provides:
An act creating mineral servitudes on noncontiguous tracts of land creates as many mineral servitudes as there are tracts unless the act provides for more.
LSA-M.C. art. 73 provides:
A single mineral servitude may not be created on two or more noncontiguous tracts of land.
In Lee v. Giauque, 154 La. 491, 492-493, 97 So. 669, 670 (1923), the court stated:
In Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 South. 209, this court held that a reservation of the oil and gas beneath the land did not create a separate estate but only a servitude, which was lost by nonuser [sic] for ten years.
* * * * * *
We are of opinion that the exercise upon any part of a continuous tract of land of a servitude extending over the whole tract preserved the servitude over the whole for the reason that there is but one servitude on the whole tract.
On the other hand, we think that servitudes extending over separate tracts of land constitute distinct servitudes; and that the exercise of the right over one of these tracts will not serve to preserve the right over other and distinct tracts.
Thus, the Parish reasons that Reagan does not apply when a lease is granted by a servitude owner. We disagree.
It is true that the mineral interest in land created by reservation "constitutes a servitude imposed upon the land, giving the owner thereof the right of ingress and egress for the purpose of exploring for and reducing to possession the minerals under the property so burdened." Horn v. Skelly Oil Co., 224 La. 709, 70 So.2d 657, 660 (1954). Even if we concede that Mr. Rose and Mr. Morris were mere servitude owners, not landowners, when they granted the Lobrano lease, it is immaterial whether the lease was granted by the owner of the land and the minerals or by the owner of a mineral servitude.
The "Comment" to LSA-M.C. art. 114 provides pertinent explanation; it states, in part:
The first sentence of Article 114 sets out a functional definition of the mineral lease....

*780 Article 114 should be read carefully in conjunction with Article 16, providing that the mineral lease falls within the generic term "mineral right" and further providing that all mineral rights are "real rights and are subject either to the prescription of nonuse for ten years or to special rules of law governing the term of their existence." Thus, the running controversy between the courts and the legislature as to the nature of the mineral lease is laid to rest by classification of the interest as a real right.... The mineral lease is not, however, subject to the prescription of nonuse. Article 115 provides the general rule that the mineral lease "may not be continued for a period of more than ten years without mining operations or production." Thus, subject to the exception made for hard mineral leases by Article 115, the parties may stipulate how a lease may be maintained, but it cannot be continued for more than ten years without drilling or mining operations having taken place.
Articles 73 and 103 provide that if a mineral servitude or mineral royalty is granted or reserved on noncontiguous tracts of land in a single deed, there are created as many servitudes or royalties as there are tracts of land. Article 114, in allowing the creation of a single mineral lease on two or more noncontiguous tracts of land, sustains established law. Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958). In that case it was argued that a mineral lease covering noncontiguous tracts was in actuality several leases and that mineral leases are subject to the same rules of prescription of nonuse as are mineral servitudes. The court rejected this proposition, holding that a single mineral lease can be granted on several noncontiguous tracts of land. The landowner in such cases is not without a remedy, for it is the established jurisprudence that the lessee must fully develop the lease property and test every part of land subject to it with reasonable diligence or suffer the lease to be cancelled. See the comment following Article 122.
In providing that operations on the lease premises or land unitized therewith will preserve the lease as to its entirety Article 114 preserves established law based on the concept that the mineral lease is indivisible. [Citations omitted.]
Furthermore, LSA-M.C. art. 116 provides that a mineral lease may be granted by any person having an executive interest in the mineral rights on the property leased. The "Comment" to that article explains: "Article 116 contemplates that leases can be granted by the landowner who owns mineral rights, the mineral servitude owner, and by the holder of executive rights over mineral rights which he does not own."
When the articles of the Mineral Code are read in pari materia, it is obvious that the legislature intended that a mineral lease not be subject to the noncontiguous rule. If the legislature had intended that a mineral lease granted by a mere servitude owner not be within the purview of the Reagan rule and Article 114, the legislature could have enacted the rule. Because there is no such restriction in the code, we conclude that Reagan should not be read so restrictively. If we were to hold that a servitude owner could not grant a lasting lease on noncontiguous tracts, we would be allowing a "back door" method of dividing a lease and making a lease susceptible to the 10-year liberative prescription of nonuse.
This court has previously noted the distinction between mineral servitudes and mineral leases, and we have viewed Reagan as an illustration of one of the differences between them. We see no reason to deviate from our previous interpretation of the statutes and the jurisprudence. This court has stated:
[T]he distinction between a mineral servitude and a mineral lease is pronounced. McCollam, A Primer for the Practice of Mineral Law under the New Louisiana Mineral Code, 50 Tul.L.Rev. 732, 785 (1976). By definition, "a mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership." LSA-R.S. 31:21. "A mineral lease is a contract by which the lessee is granted the right to *781 explore for and produce minerals." LSA-R.S. 31:114.
The mineral servitude is subject to the prescription of nonuse for ten years. LSA-R.S. 31:27. The mineral lease, although not subject to the prescription of nonuse, can not be continued for longer than ten years without drilling, mining operations, or production. LSA-R.S. 31:115; Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958). The grantor of a mineral servitude ceases to be the owner of the mineral rights; the lessor of a mineral lease continues to be the owner of the mineral rights. See McCoy v. United Gas Public Service Company, 57 F.Supp. 444 (E.D. [sic] La.1944). A mineral lease, unlike a mineral servitude, is not subject to the contiguity rule established with respect to servitudes in Lee v. Giauque, 154 La. 491, 97 So. 669 (1923), LSA-R.S. 31:114; Reagan v. Murphy, supra. (Emphasis supplied.)
Wall v. Leger, 402 So.2d 704, 709-710 (La. App. 1st Cir.1981). Our view of Louisiana law has been shared by other commentators. See Martin and Yeates, Louisiana and Texas Oil & Gas Law: An Overview of the Differences, 52 La.L.Rev. 769, 826 (1992), wherein the authors state, without qualification, that a single lease may cover separate, noncontiguous tracts, and that operations on one tract will continue the entire lease as to all tracts unless the terms of the lease provide otherwise.
Because of our analysis of the Parish's contentions and the trial court's judgment and reasons for judgment, it is unnecessary for us to discuss the Parish's fifth and final assignment of error.
Accordingly, we find it proper to affirm the judgment of the trial court, although for reasons different from those of the trial judge. We assess the Parish for all costs of this appeal, in the amount of $ 838.00.
AFFIRMED.

*782 EXHIBIT A

ON REHEARING[*]
WATKINS, Judge.
We have granted a rehearing in this case to make certain deletions from our original opinion and to respond to a request by appellant, Plaquemines Parish Government (Parish).
In our original decision we held that the Lobrano lease was "alive" as to the allegedly expired servitude areas because under the facts of this case, LSA-M.C. art. 114, and Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958), it is immaterial whether the lease was granted by the owner of the land and the minerals or by the owner of mineral servitudes. We remain convinced of the correctness of this holding.
However, in our original opinion we cited Martin and Yeates, Louisiana and Texas Oil & Gas Law: An Overview of the Differences, 52 La.L.Rev. 769, 826 (1992). Attached to the Parish's application for rehearing is an affidavit by Professor Patrick H. Martin, stating that we have taken his statement regarding single leases on noncontiguous tracts out of context. Professor Martin's affidavit is a disclaimer of the result and reasoning in our original opinion. If we have misquoted Professor Martin, it was unintentional. In light of the fact that the secondary authority of his article is totally unnecessary for the completeness of our decision, we delete any reference to his text.
Another secondary authority, McCollam, A Primer for the Practice of Mineral Law under the New Louisiana Mineral Code, 50 Tul.L.Rev. 732, 785 (1976), is found in a quotation in our original opinion from the case of Wall v. Leger, 402 So.2d 704, 709-710 (La.App. 1st Cir.1981). In light of the fact that that reference was made by another panel of this court approximately 14 years ago, we cannot delete the reference as we have done for Professor Martin's article.
Initially, the Parish complains that we decided the case on an issue which it had not briefed; the Parish briefed the issue in conjunction with its application for rehearing. In order to assure total fairness to all parties, we will consider the arguments asserted by the Parish in its application for rehearing.
Acknowledging this court's specification that the articles of the Mineral Code are to be read in pari materia, the Parish, nevertheless, contends this court failed to consider the articles regarding servitudes and executive rights, and in particular, failed to apply Article 117. Our failure to mention those articles specifically did not mean that we did not consider them, but merely that we did not find they were germane to the issue. After an assiduous reconsideration of the entire Mineral Code, we have decided, lest our original opinion be misunderstood, to reiterate and enlarge our interpretation of the code, including all articles that have bearing on the issue before us, which is the continued viability vel non of the Lobrano lease.

THE MINERAL CODE REVISITED
The Louisiana Mineral Code, LSA-R.S. 31:1 et seq, adopted in 1974, was the result of a study begun by the Louisiana State Law Institute with the concurrence of the Mineral Law Section of the Louisiana Bar Association. LSA-M.C. "Introduction." The code was designed to supplant by legislation the extensive jurisprudence that had developed dealing with Louisiana mineral law. Prior to the code, Louisiana's mineral law was "a product of jurisprudential development principally by way of analogy to the provisions of the Louisiana Civil Code relating to servitudes but including particularly also the general rules of conventional obligations and leases." Id. A primary purpose of the code was to provide the state's mineral law with the coherence that is characteristic of a code. No basic changes in the prior law were intended; the modifications made were mostly by way of clarification. Id.
The provisions of the Mineral Code are supplementary to those of the Civil Code and *784 apply specifically to mineral law. In the event of conflict between the provisions of the Mineral Code and the Civil Code or other statutes, the Mineral Code prevails. If the Mineral Code does not expressly or impliedly provide for a particular situation, other statutes apply. LSA-M.C. art. 2.
Individuals may renounce or modify what is established in their favor by the provisions of the Mineral Code if their renunciation or modification does not affect the rights of others, is not contrary to the public good, or is not expressly or impliedly prohibited by law. LSA-M.C. art. 3. Thus, freedom of contract is limited by basic principles of public policy. Articles 73 through 75, applicable to mineral servitudes, prohibit: the creation of one servitude on two or more noncontiguous tracts of land, contracting for a prescriptive period greater than ten years, and making the rules of use of mineral servitudes less burdensome than those provided by the Mineral Code. Article 103 makes those same limitations applicable to the creation of mineral royalties. The provisions of Articles 119 and 122, that mineral leases be entered into and performed in good faith, are grounded in public policy and cannot be contracted away. LSA-M.C. art. 3 "Comment."
"A landowner may convey, reserve, or lease his right to explore and develop his land for production of minerals and to reduce them to possession." LSA-M.C. art. 15. "The basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease." LSA-M.C. art. 16. Article 11 of the Mineral Code provides a flexible formula governing the relationship between the mineral servitude owner and the owner of the servient estate that permits concurrent uses of land. LSA-M.C. art. 11 "Comment." The owner of land burdened by a mineral right and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other, as must the owners of separate mineral rights in the same land. LSA-M.C. art. 11.
In the instant case, we are primarily concerned with the mineral lease and its effect on the future rights of the mineral lessee as compared to the future rights of the landowner to whom the allegedly extinguished servitudes reverted.
The mineral lease is a contract for the right to explore for and produce minerals. LSA-M.C. art. 114. The mineral lease, the mineral servitude, and the mineral royalty are real rights and are subject either to the prescription of nonuse for ten years or to special rules of law governing the term of their existence. LSA-M.C. art. 16. The mineral lease is not subject to the prescription of nonuse, but the lease must have a term. LSA-M.C. art. 115.
The "Comment" to Article 16 provides the following explanation:
The characterization of all "mineral rights" as real rights in land reflects present law insofar as mineral servitudes, mineral royalties, and similar interests are concerned. However, the characterization is at least a superficial change from the judicial attitude toward the mineral lease.... Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958).... It is intended that this article make it clear that the mineral lease is a species of mineral rights and, as a result of that classification, is a real right. However, this does not mean that the mineral lease is necessarily subject to rules of liberative prescription governing such rights as mineral servitudes.... By way of functional comparison, the lease, like the mineral servitude, conveys rights to explore and develop, to produce minerals, to reduce them to possession, and to assert title to a specified portion of the production.... All things considered, the lease has the major characteristics of a real right: the mineral lessee may follow the land, regardless of transfers of ownership; the mineral lessee may assert his rights against the world just as the proprietor of any other real right; he may enjoy directly and draw from the land a part of its economic advantages by appropriating a wasting asset; he has certain rights of preference; and he holds a right that is in reality susceptible of a type of possession through exercise.... The basic purpose of this article is to recognize that insofar as the mineral lease transfers both operating rights and rights to production *785 it is a real right and not a mere personal contract.
The reservation stating that all mineral rights are either subject to prescription or specified rules of statutory law is intended to allow the establishment of desired principles necessary to accommodate peculiar features of the mineral lease. Principal among these is the limitation that a mineral lease must have a term and may not be continued for more than ten years without drilling or mining operations or production. Article 115. The reservation also makes allowances for the so-called "imprescriptible" mineral rights that arise from conveyance to the United States, or any of its agencies or subdivisions, or to the State of Louisiana or any of its subdivisions. See Articles 149 through 152, formerly La.R.S. 9:5806 (1950, as amended).
Mineral rights, including the mineral servitude, the mineral royalty, and the mineral lease, are incorporeal immovables. LSA-M.C. art. 18. "Although there has been considerable confusion over whether the interest of the lessee under a mineral lease is a real right or merely a personal contract, there is no doubt that the lease creates an incorporeal immovable." LSA-M.C. art. 18 "Comment."
A single lease may be created on two or more noncontiguous tracts of land. Operations on the land burdened by the lease or land unitized therewith that are sufficient to maintain the lease according to its terms will continue the lease in force for the entirety of the land. LSA-M.C. art. 114. This provision is in contrast to Articles 73 and 103 providing that if a mineral servitude or mineral royalty is granted or reserved on noncontiguous tracts of land in a single deed, there are created as many servitudes or royalties as there are tracts of land. "Article 114, in allowing the creation of a single mineral lease on two or more noncontiguous tracts of land, sustains established law. Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958)." LSA-M.C. art. 114 "Comment." In Reagan the court held that a single mineral lease can be granted on several noncontiguous tracts of land. Although the original landowner's reservation of minerals (servitude) had expired for nonuse and the minerals had reverted to the new landowners, the latter were not without a remedy. It is the established jurisprudence that the lessee must fully develop the leased property and test every part of land subject to it with reasonable diligence or suffer the lease to be cancelled. LSA-M.C. art. 114 "Comment"; see also, LSA-M.C. art. 122 "Comment" for thorough discussion of lessee's obligation of "reasonable development" and "further exploration."
Despite the provisions of the Mineral Code concerning leases, the Parish maintains that the rule of Reaganthat the liberative prescription of 10 years cannot be applied to a mineral leaseis operative only in instances where the landowner, as contrasted with a servitude owner, has granted the lease on noncontiguous tracts of land. As we examine the Parish's position, we are presented with the question: who may grant a mineral lease?
A mineral lease may be granted by any person having an executive interest in the mineral rights on the property leased. LSA-M.C. art. 116. By its nature, the executive right is the exclusive right to grant mineral leases on land or mineral rights. The owner of an executive right may lease the land or mineral rights over which he has power to the same extent and on such terms and conditions as if he were the owner of a mineral servitude. LSA-M.C. art. 105. Although the executive right may exist independently, it can also be a part of another form of mineral right, such as a mineral servitude. LSA-M.C. art. 106. The executive right is a mineral right, and thus, an immovable real right. Id.; see also, LSA-M.C. art. 16.
Thus, the landowner who owns mineral rights, the mineral servitude owner, and the holder of executive rights over mineral rights which he does not own may all grant mineral leases. LSA-M.C. art. 116 "Comment." Article 120 provides that the warranty made by the mineral lessor is that of the seller of land. Thus, the mineral lessor must be one who is the owner of or has executive rights over the property being leased. LSA-M.C. art. 116 "Comment." *786 In the instant case, the Rose and Morris servitude included executive rights over 50 percent of the minerals in all of the land. In other words, Rose and Morris possessed the right to lease their minerals; that right was not retained by the Parish's ancestor in title. When a mineral right, such as a servitude, is created and is accompanied by an executive right, the executive right is an appendage of the mineral right and is extinguished with it. LSA-M.C. art. 113. If we accept for the sake of argument that the Rose and Morris servitudes were extinguished on the noncontiguous tracts by the prescription of 10 years of nonuse, then the Rose and Morris executive rightsthe rights to leasewere extinguished with them. Therefore, after prescription accrued, Rose and Morris were without the capacity to enter into new leases on the expired servitude areas. This state of affairs, however, is far different from the contention made by the Parish: that the leases previously granted on the Rose and Morris servitudes for the noncontiguous lands expired with the servitudes.
Finally, we will examine Article 117, which the Parish contends we failed to apply. The Parish has cited no authorityand we have located nonefor the proposition that the owner of a servitude subject to the prescription of 10 years of nonuse is an owner under conditional title within the purview of Article 117. Our reading of the unambiguous language of Article 117 convinces us that such a proposition is untenable. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written; no further interpretation may be made in search of the intent of the legislature. LSA-C.C. art. 9; Tex/Con Oil & Gas Co. v. Batchelor, 634 So.2d 902 (La.App. 1st Cir.1993), writ denied, 94-0270 (La.3/18/94), 635 So.2d 1102.
Article 117 is captioned: "Granting of mineral lease by owner under conditional title." For a servitude owner to hold title to the servitude under a conditional title, the obligation of the servient estate must be dependent on an uncertain event. LSA-C.C. art. 1767. "If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory." [Emphasis supplied.] Id. Thus, if we were dealing only with the caption of Article 117, as set forth in the first sentence of this paragraph, title to the servitude would be a conditional title, subject to the resolutory condition of nonuse for 10 or more years, because the accrual of prescription is an uncertain event. However, despite its caption, LSA-M.C. art. 117 states: "A mineral lease may be granted by the owner of an executive interest whose title is extinguished at a particular time or upon the occurrence of a certain condition, but it terminates at the specified time or on occurrence of the condition divesting the title."
Absent a condition other than prescription, the owner of a servitude subject to the prescription of 10 years of nonuse meets neither of the two terms in Article 117: first, "owner of an executive interest whose title is extinguished at a particular time"; and second, "owner of an executive interest whose title is extinguished ... upon the occurrence of a certain condition." First, the servitude owner's title is not subject to extinction at a particular time despite the fact that it will be extinguished in 10 years if not used. If there is production, title is not terminated in 10 years; thus, there is no "specified" time for termination of the servitude. Indeed, the Parish concedes that there was sufficient production on some of the tracts to preserve the Rose and Morris servitudes; thus, as to those tracts, the servitudes were not extinguished at all, much less at a particular time. Second, production on some of the tracts also proves that the servitudes were not subject to a certain condition. The Parish admits prescription never accrued on the tracts on which there was production. Therefore, the alleged accrual of prescription on the other tracts was an uncertain event. Accordingly, we find no merit to the Parish's contention that Article 117 of the Mineral Code precludes our decision that a servitude owner can grant a lease that will extend beyond the life of the servitude.
Nor do the cases cited by the Parish support the Parish's contention that our decision in the instant case is contrary to the controlling jurisprudence.
*787 In Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (1920), the Louisiana Supreme Court held that a reservation of rights to oil and gas beneath the land did not create a separate estate but only a servitude, which was lost by nonuse for 10 years. An act establishing mineral servitudes on noncontiguous tracts creates as many servitudes as there are tracts. LSA-M.C. art. 64. The jurisprudence has recognized that drilling on any part of a contiguous tract of servitude land extends over the whole tract preserving the servitude over the whole; however, drilling on one noncontiguous mineral servitude tract will not interrupt prescription on the other noncontiguous mineral servitude tract. Lee v. Giauque, 154 La. 491, 97 So. 669 (1923). Although the Parish cites several cases that have relied on Lee v. Giauque, only two of them were decided after Reagan v. Murphy.
In Ultramar Oil & Gas Ltd. v. Fournet, 598 So.2d 645 (La.App. 3d Cir.), writ denied, 605 So.2d 1122 (La.1992), the court applied the noncontiguous rule to a royalty interest, despite the fact that the deeds creating them described the 518.30 acres, which were divided by a canal owned by a third party, as one tract of land. Because a royalty interest is different from a mineral lease, the case is inapposite to the proposition urged by the Parish: that a mineral lease expires where the servitude of the lessor expires for nonuse in 10 years.
The second case is Vermilion Bay Land Co. v. Phillips Petroleum Co., 93-1393, (La. App. 4th Cir. 11/10/94) 646 So.2d 408, writ denied, 94-3004 (La. 3/10/95), 650 So.2d 1176. The plaintiff sued to have defendants' mineral servitudes and mineral leases declared terminated for nonuse on noncontiguous tracts. The Parish claims the Phillips Petroleum Company abandoned its claim that the lease would not terminate even if defendants' other rights terminated. Although the trial court apparently rendered judgment, which the appellate court affirmed, terminating the leases as well as the servitudes, it appears the issue was not addressed by the appellate court. Consequently, we do not consider that case persuasive authority for the proposition asserted by the Parish.
Finally, the Parish contends that by applying Article 114 of the Mineral Code, we are applying the wrong law, as the Parish's rights were vested prior to the adoption of the code in 1974. Such a contention is untenable in light of the clear indication by the redactors of the code that the rule of Reagan v. Murphy was being incorporated in Article 114 and other articles relating to mineral leases.
Indeed, the pragmatic arguments made by the Parish in this case, and especially in its application for rehearing, mirror the concerns expressed by Justice Tate in his dissent in Reagan, 105 So.2d at 215. Our opinion in the instant case in no way belittles the legitimate concerns expressed by Justice Tate, we find in fact substantial merit in his views. However, his opinion was not shared by the majority of the Louisiana Supreme Court, and it did not become the controlling law at the time the Reagan decision was rendered. More importantly, Justice Tate's view apparently was rejected by the redactors of the Mineral Code when they incorporated the Reagan rule in the code. Accordingly, this court is bound by the provisions of the Mineral Code and Reagan.
The rule since Reagan is unqualified: a mineral lease is not subject to the prescription of 10 years of nonuse or to the noncontiguous rule. To engraft onto the mineral lease the rule that the mineral lease expires when the servitude of its grantor expires would be tantamount to the creation by this court of an exception to the rule that is not found in the Mineral Code. The Parish and others who find this rule illogical and predict bizarre results have recourse with the legislature, not in the courts.
REHEARING GRANTED FOR LIMITED PURPOSE STATED HEREIN; OTHERWISE DENIED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special assignment of the Louisiana Supreme Court.
[2] The Parish also sought an accounting from the defendant oil companies for the production from the Expired Servitude Areas since the dates they allegedly reverted to the Parish.
[3] The value of receiving the expired servitudes not burdened by a lease has been described as follows:

[T]he present landowner ... has lost by the ancient action of his predecessor in title the most valuable rights pertaining to the mineral interest he theoretically acquired when [the] mineral servitude was extinguished by non-user: the right to bargain for and receive a bonus for granting a lease; the right to bargain for and receive greater annual rentals (the payment of which rentals to these landowners under the present lease has been unnecessary because of production on non-contiguous lands belonging to others covered by the lease); and the right to bargain for and receive a greater share of production as royalty rental....
Reagan v. Murphy, 235 La. 529, 105 So.2d 210, 216.
[4] See the companion case, Jones v. Sun Oil Company, 235 La. 554, 105 So.2d 219 (1958).
[*] Editor's Note: This rehearing opinion also applies to docket number 94 CW 1832, reported at 662 So.2d 788.