673 So.2d 1002 (1996)
PLAQUEMINES PARISH GOVERNMENT
v.
GETTY OIL COMPANY, et al.
No. 95-C-2452.
Supreme Court of Louisiana.
May 21, 1996.
Rehearing Denied June 28, 1996.
*1003 Ernest R. Eldred, Larry DeWayne Dyess, for Applicant.
J. Carter Wilkinson, G. William Jarman, Susan Knight Carter, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman; Louise V. White, Lourdes Estevez Martinez, William Victor Courtney, Exxon Company, U.S.A., M. Hampton Carver, Marshall Taylor Darden, Stacy Smith Brown, Carver, Darden, Koretzky; J. Clayton Johnson, Jr., Taylor, Porter, Brooks & Phillips; Frederick W. Veters, John Donellan Fitzmorris, Jr., Victor F. Aguiluz, for Respondents.
MARCUS, Justice.[*]
The issue in this case is whether the leases held by the defendant oil companies are dependent *1004 on the continued viability of certain mineral servitude interests.
In order to resolve this issue, it is necessary to review the history of the property in question. In 1812 "West Bay was a navigable body of water owned by the State of Louisiana by its inherent sovereignty. In 1836 the Mississippi River broke through a small fisherman's canal near Wilders Bayou and poured its waters through a very large crevasse (known as "the Jump") into the adjacent West Bay. The immense amount of sedimentary deposit carried in by the river led to an immediate and rapidly growing formation of land. Eventually this silt filled in much of West Bay and dry land was created. This land retained its status as "sovereignty lands."
In 1894 the Louisiana Legislature created the Buras Levee District and authorized the State to transfer to the Levee District swamplands acquired from the federal government. Although the transfer of sovereignty lands was not authorized by the legislation, the Buras Levee District transferred title to some of the aforementioned sovereignty lands in the West Bay area to James D. Lacey in 1896.
In 1910 the Louisiana Legislature authorized the State to transfer to the Levee District sovereignty lands within the District. By deed dated May 22, 1928, the State transferred to the Levee District the West Bay area lands in dispute in this litigation. That deed reserved all navigable water bottoms to the State. On May 23, 1928, the Levee District ratified the 1896 transfers of sovereignty lands to Lacey by executing an Act of Confirmation with Lacey's successor, Emile J. Rose. A month earlier, Rose and Robert L. Morris Jr.[1] had granted a mineral lease over the subject property to Gulf Refining Company ("Gulf").
On September 8, 1928, a new Levee District Board authorized a lawsuit to set aside and nullify the Act of Confirmation and the mineral lease which had been granted by Rose and Morris to Gulf. On the same day, the new Board authorized a lease to be granted on the disputed acreage to Robert J. Lobrano. The Lobrano lease was granted on September 13, 1928 and covered the disputed lands previously transferred to Lacey and included in the Act of Confirmation.
On February 15, 1929, the Levee District filed suit against Rose, Morris and others claiming rights in the land.[2] The trial judge found the West Bay lands to be sovereignty lands which could not have been transferred to Lacey in 1896. He therefore rendered a judgment decreeing the Levee District to be the owner of the property and canceling the lease Rose and Morris had granted to Gulf.
While an appeal was pending in the Louisiana Supreme Court, the parties entered into a settlement and compromise which was then incorporated into a consent decree issued by this court on July 18, 1930. The settlement and compromise was evidenced by four documents: (1) an Agreement of Compromise; (2) the July 18, 1930 Louisiana Supreme Court consent decree; (3) an Assignment of the Lobrano lease to Gulf; and (4) an Overriding Royalty Agreement in favor of Robert J. Lobrano from Gulf.
The consent decree provided that 100% of the land (hereinafter "compromise lands") was owned by the Levee District while the mineral rights were owned 50% by the Levee District, 25% by Rose, and 25% by Morris. The 1928 Lobrano lease was recognized as valid and binding on all parties. As part of the compromise, Lobrano then assigned the lease to Gulf and the lease to Gulf by Rose and Morris was declared invalid as to the *1005 compromise lands. Finally, an overriding royalty agreement in favor of Lobrano was executed in consideration of the assignment of his lease to Gulf.[3]
In 1987 the Plaquemines Parish Government ("PPG"), as successor to the Buras Levee District, filed the instant lawsuit to have the Rose and Morris mineral servitudes on the compromise lands, and the lease with which they are burdened, declared expired. PPG also sought an accounting from the defendant oil companies[4] for the production from the "expired servitude areas" since the dates they allegedly reverted to PPG. The heirs of Robert J. Lobrano intervened to protect their interests.
In its petition, PPG alleges that the Rose and Morris servitudes expired due to the liberative prescription of ten years nonuse, and therefore, any lease granted by Rose and Morris has also terminated. Thus PPG would now own 100% of the mineral rights and the Lobrano lease would be cancelled with regard to the 50% reversionary interest. The basis for this argument is as follows. PPG alleges that the 1928 reservation of navigable water bottoms by the State created noncontiguous tracts in the West Bay lands transferred to the Levee District. A mineral servitude owner may not create a single servitude on noncontiguous tracts; instead, there are as many servitudes as there are tracts. See La. Mineral Code art. 64. Therefore, PPG contends that, when Rose and Morris reserved their mineral interests in the 1930 consent decree, they created several servitudes on noncontiguous tracts. Although there was production on some of the tracts of the compromise lands subject to the Rose-Morris mineral servitudes, PPG claims there were also noncontiguous tracts on which there was no production. These are the alleged expired servitude areas that would have reverted to PPG ten years after the compromise agreement.[5] PPG concludes that the granting of a lease by Rose and Morris on several noncontiguous mineral servitudes and the drilling of a well on one tract did not preserve the mineral servitude or the lease on the other noncontiguous tracts. Thus, according to PPG, the 50% reversionary mineral interest is no longer subject to the Lobrano lease.
The Lobrano heirs filed a motion for summary judgment seeking to have the Lobrano lease recognized as binding on 100% of the compromise lands. PPG then filed a motion for summary judgment against the Lobrano heirs and the oil company defendants, arguing that the Lobrano heirs' interest would not be affected by the cancellation of the Rose and Morris servitudes and thus the Lobrano heirs should be dismissed from the suit. Finally, the oil company defendants filed their own motion for a partial summary judgment and adopted the Lobrano heirs' brief in support of their motion.
The trial judge concluded that the Lobrano lease remained in full force and effect as to the full 100% mineral interest in the expired servitude area[6] and therefore denied PPG's motion for summary judgment while granting the motions filed by the oil company defendants and the Lobrano heirs. This finding was based on the determination that, under the 1930 consent decree, the effectiveness of the Lobrano lease was not contingent upon the continued existence of the Rose and *1006 Morris servitudes. The court of appeal[7] affirmed on different grounds, holding that, under Mineral Code arts. 114, 115, and 116, a mineral lease granted by Rose and Morris on their servitudes would survive even if the servitude terminated.[8] Upon application by PPG we granted certiorari to review the correctness of that decision.[9]

DISCUSSION
The sole issue in this case is whether the September 13, 1928 Lobrano lease terminated with respect to a one-half interest, assuming the Rose and Morris mineral servitudes have prescribed due to ten years nonuse. In other words, is the Lobrano lease dependant on the continued viability of the Rose and Morris servitudes?
To answer this question we must determine whether Rose and Morris granted a new lease to Lobrano in 1930 or whether they merely acquiesced in the enforcement of the 1928 lease granted by the landowner (the Levee District), i.e., was the lease granted by a mineral servitude owner or a landowner? If Rose and Morris granted a lease then that lease is dependent on the continued viability of their servitudes. See La.Mineral Code arts. 117, 27, 64, 73; Lee v. Giauque, 154 La. 491, 97 So. 669 (1923). If, however, there is only the one lease granted by the Levee District in 1928 then the expiration of the servitude rights would have no effect on the continued viability of that lease. See La.Mineral Code art. 114, 115; Reagan v. Murphy, 235 La. 529, 105 So.2d 210 (1958).
The relationships between the parties to this litigation and their respective rights are governed by the 1930 consent decree. Therefore, it is critical to determine exactly what that judgment decreed.
A consent judgment is a bilateral contract wherein parties adjust their differences by mutual consent and thereby put an end to a lawsuit with each party balancing hope of gain against fear of loss. La.Civ. Code art. 3071; Preston Oil Co. v. Transcontinental Gas Pipe Line Corp., 594 So.2d 908, 913 (La.App. 1st Cir.1991). A judgment, whether it results from the assent of the parties or is the result of a judicial determination after a trial on the merits, is and should be accorded sanctity under the law. Preston Oil Co., 594 So.2d at 913.
One of the most important functions of this consent decree was its determination of ownership rights. Prior to the compromise, both sides had claimed full ownership of the land and minerals, but in the settlement, the Levee District waived its claim to one-half of the minerals and recognized them as belonging to Rose and Morris. In response, Rose and Morris waived their claim to the ownership of the land and one-half of the minerals which they recognized as being owned by the Levee District. As a result, both sides kept a portion of what they claimed to own, but neither side transferred or conveyed new rights to the other.[10] 2 M. *1007 Planiol, Treatise on the Civil Law pt. 2, no. 2295 (11th ed. La.St.L.Inst.Trans.1959); see also, American Lung Ass'n v. State Mineral Bd., 507 So.2d 184, 191 (La.1987). Hence, it is clear that the consent judgment of 1930 did not create the Rose and Morris mineral servitudes but merely recognized them as pre-existing rights. Thus the settlement did not violate the 1921 constitutional prohibition against the alienation of state owned mineral rights.[11]
The consent judgment also addressed the validity and effect of the mineral leases. Paragraph Six provided that the lease by the Buras Levee District to Lobrano dated September 13, 1928 is recognized as "valid, legal and binding upon all of the parties to this decree with rent paid up to September 13, 1930." Paragraph Eight then stated that the 1928 Lobrano lease "is binding upon and includes and covers" the Rose and Morris mineral interests.
Thus only one lease survived the 1930 consent decree and that is the Lobrano lease granted by the Levee District in 1928. The lease previously granted by Rose and Morris to Gulf was voided in Paragraph Two. No new lease was created or recognized. Rather, the parties to the settlement intended the original 1928 Lobrano lease to be valid and binding even on the Rose and Morris mineral interests. There is no suggestion anywhere in the consent decree that the parties meant to weaken the Lobrano lease by making it subservient or dependent on the continued existence of the Rose and Morris servitudes. Rather, it seems to have been a part of the bargained-for compromise that the validity of the lease granted by the Levee District be recognized.[12]
PPG, however, seizes on language in Paragraph Eight which, it says, supports its theory that a new lease was granted by operation of the 1930 decree. This language is contained in the final sentence of Paragraph Eight and provides that one half of all rentals and royalties under the 1928 Lobrano lease shall be paid directly to Rose and Morris and one half to the Levee District "as provided, permitted or authorized under said lease, each of said named parties, being considered, to the extent of his or its interest as aforesaid as grantor of said lease." A common sense reading of the 1930 consent decree as a whole contradicts PPG's position. This "grantor" provision on which PPG places such reliance served merely to establish privity of contract between Rose and Morris and Gulf, thereby allowing Rose and Morris to enforce the lease by a personal action in contract against the lessee and vice versa. Today, it is clear that a mineral lease is a real right which can be enforced against the world by a real action. La.Mineral Code art. 16. However, in the 1930s, the law was not clear on whether a mineral lease gave rise to real rights or personal rights. See Gulf Refining Co. of Louisiana v. Glassell, 186 La. 190, 171 So. 846 (1936) (discussing the earlier jurisprudence on this issue); see also, Note, The Juridical Nature of Oil and Gas Rights in Louisiana, 9 TUL.L.REV. 275 (1934). Thus this "grantor" language was intended to ensure that Gulf and Rose and Morris would be able to enforce the Lobrano lease against one another.
In sum, we find that only one lease survived the 1930 consent decreethe 1928 Lobrano lease. That lease was signed by the Buras Levee District as landowner and purported to cover the entirety of the compromise lands. Despite the questions regarding the Levee District's title to the lands, Rose and Morris affirmed that lease and its consequences. Rather than risk losing all rights by pursuing their appeal, Rose and Morris chose to accept a compromise which recognized *1008 their mineral interests subject to a preexisting lease.
The effect of the compromise is that the Lobrano lease was granted by a landowner, not a mineral servitude owner. Thus the termination of the Rose and Morris servitudes would have no effect on the validity of the lease. A landowner is entitled to create one lease covering several noncontiguous tracts; operations on any of the tracts are sufficient to maintain the lease as to the entirety of the land burdened. La.Mineral Code art. 114. Therefore, we conclude that the Lobrano lease remains valid and binding on 100% of the compromise lands.

DECREE
For the reasons assigned, but on different grounds than those of the court of appeal, the judgment of the court of appeal is affirmed. All costs are assessed against the Plaquemines Parish Government.
LEMMON, J., dissents and will assign reasons.
NOTES
[*] Because of the vacancy created by the resignation of Dennis, J., now a judge on the United States Court of Appeals for the Fifth Circuit, there was no justice designated "not on panel" under Rule IV, Part 2, Sec. 3. Panel included Chief Justice Calogero and Justices Marcus, Watson, Lemmon, Kimball, Johnson and Victory.
[1] Rose had transferred to Morris an undivided one-half interest in the mineral rights as well as a surface lease over the subject property in 1928.
[2] The defendants in that suit were Emile J. Rose who claimed full ownership of the land; Robert L. Morris who held mineral servitudes as well as a surface lease; Tiger Pass Corporation which had been assigned Morris' trapping rights on the land; Samuel George who held certain trapping rights assigned by Rose; Tambour Corporation which eventually bought Rose's rights in the property; and finally Gulf Refining Corporation which held a mineral lease granted by Rose and Morris.
[3] Since the consent decree, one-half of the royalties accruing under the Lobrano lease have been paid to the Buras Levee District and the other one-half to Rose and Morris, or their heirs. Pursuant to the 1930 Overriding Royalty Agreement, overriding royalty payments have been made to Robert J. Lobrano, his heirs and assigns.
[4] The oil company defendants are Getty Oil Company, Texaco Inc., Texaco Producing Inc., Chevron U.S.A. Inc., and Exxon Corporation.
[5] At least one of the oil company defendants has admitted that no wells were drilled in the Expired Servitude Area until 1961, over thirty years after the consent decree. Thus, if those areas truly are noncontiguous tracts then the servitudes covering those tracts would have expired.
[6] The issue of whether the area compromised contains noncontiguous tracts has yet to be resolved and was merely assumed by the defendants for the sole purpose of determining the legal question at issue in the summary judgmentwhether the Lobrano lease terminated with respect to a one-half interest if, and when, the Rose and Morris mineral interests prescribed for ten years nonuse.
[7] This case was assigned to the Court of Appeal, First Circuit after all of the judges of the Fourth Circuit recused themselves.
[8] 94-1634 (La.App. 1st Cir. 5/5/95), 662 So.2d 773. The court of appeal reasoned that because a mineral lease is not subject to the prescription of 10 years nonuse or to the noncontiguous rule, a mineral lease granted by a servitude owner could actually outlive the rights of the lessor. In other words, even if the lessor's rights to the minerals terminated, the lease would remain valid. On rehearing PPG argued that Mineral Code art. 117 specifically provides otherwise. Article 117 provides that a lease granted by an owner under conditional title terminates when the owner is divested of his title. However, the court of appeal found art. 117 to be inapplicable, holding that a mineral servitude was not ownership under a conditional title.
[9] 95-2452 (La. 1/26/96), 666 So.2d 659.
[10] As described by Planiol in his Treatise on the Civil Law:

The compromise does not have the effect of conferring new rights on the parties, but only of recognizing those which they claim to have, and to consolidate them by protecting them from further litigation. It is therefore, not an act transferring rights, but purely an act in recognition, or declaratory, of such rights. Neither party (with respect to the rights recognized as theirs in the act) acquires the thing of the other, and does not, therefore, succeed to it; the parties merely kept what they already claimed to belong to them by obtaining the waiver of the other; but they do not acquire anything.
2 M. Planiol, Treatise on the Civil Law pt. 2, no. 2295 (11th ed. La.St.L.Inst.Trans.1959).
[11] PPG accepts that a good faith compromise is not a prohibited alienation of mineral rights. However, PPG contends that Rose and Morris had to have granted a new lease on their one-half of the minerals because it would have been unconstitutional for the Levee District to have recognized the Rose and Morris mineral interests subject to the pre-existing Lobrano lease. This argument is without merit. There is no constitutional prohibition against a private party agreeing to subject his mineral interest to a state granted lease particularly when the state makes arrangements for that party to be adequately compensated.
[12] See, for example, Paragraph Six which not only recognizes the lease but acknowledges its existence and coverage for the previous two years.